Ex parte DUNCAN.

KAHANAMOKU, Sheriff, v. DUNCAN.

Ex parte WHITE.

STEER, Provost Marshal, Central Pacific Area, v. WHITE.

Nos. 10763, 10774.

Circuit Court of Appeals, Ninth Circuit. Nov. 1, 1944.

Writ of Certiorari Granted Feb. 12, 1945.

See 65 S.Ct. 677.

Reversed.

Edward J. Ennis, Sp. Asst. to the Atty. Gen., and G. D. Crozier, U. S. Atty., of Honolulu, Hawaii (Myron C. Cramer, Ma-

jor General, The Judge Advocate General, U. S. Army, and William J. Hughes, Jr., Lt. Colonel, Judge Advocate General's Dept., both of Washington, D. C. and Eugene V. Slattery, Lt. Colonel, Judge Advocate General's Dept. U. S. Army, and Edward A. Towse, Asst. U. S. Atty., both of Honolulu, Hawaii, John L. Burling, Nanette Dembitz, and Elmer Million, Attys., War Division, Dept. of Justice, all of Washington, D. C., of counsel), for appellants.

Garner Anthony of Honolulu, Hawaii (Robertson, Castle & Anthony, of Honolulu, Hawaii, of counsel), for appellee Duncan.

Fred Patterson and E. J. Botts, both of Honolulu, Hawaii, and Herbert Chamberlin of San Francisco, Cal., for appellee White.

Marguerite K. Ashford, J. Russell Cades, Phil Cass, William H. Heen, Marshall B. Henshaw, Harry R. Hewitt, Livingston Jenks, Ernest K. Kai, Herbert K. H. Lee, Charles F. Parsons, D. Hebden Porteus, E. White Sutton, and Heaton L. Wrenn, all of Honolulu, Hawaii, for Bar Association of Hawaii, amicus curiae.

Wayne M. Collins, of San Francisco, Cal. (Osmond K. Fraenkel and Arthur Garfield Hays, both of New York City, and A. L. Wirin, of Los Angeles, Cal., of counsel), for American Civil Liberties Union, amicus curiae.

Before WILBUR, GARRECHT, DENMAN, MATHEWS, STEPHENS, and HEALY, Circuit Judges.

HEALY, Circuit Judge.

The appeal in each of these cases is from a judgment of the United States District Court for the Territory of Hawaii sustaining a petition for a writ of habeas corpus and ordering the discharge of the petitioner.

In case No. 10,774 the essential facts are as follows: Appellee Harry E. White is a citizen of the United States and of the Territory of Hawaii. On August 20, 1942, while engaged in Honolulu as a civilian in a brokerage and investment business, he was arrested and brought before Major Murrell, judge of the provost court, who informed him that he was to be tried before that court on a charge of embezzlement growing out of the conduct of his business, in violation of Chapter 1831, Revised Laws of Hawaii, 1935. He was on August 25, 1942, tried by the provost court upon that charge, without a jury, was convicted and sentenced to imprisonment for a term of five years. The sentence imposed was within the limits prescribed by the territorial statute.

On April 14, 1944, White filed his petition in the court below for release on habeas corpus, asserting lack of jurisdiction in the provost court and claiming that he had been deprived of the rights guaranteed by the 5th and 6th Amendments. The court issued a show cause order directed to the warden of Oahu Prison. It was later ordered, on stipulation, that Colonel Steer, Provost Marshal of the Central Pacific Area, and then custodian of the petitioner, be substituted as respondent in lieu of the warden. The Provost Marshal filed an answer in which he admitted the facts as stated above but denied that the trial and imprisonment were unlawful. The answer contained affirmative matter, alleging among other things, the suspension of the privilege of the writ, the declaration of martial law, and the existence as of August 1942, of an emergency necessitating the trial of civilians by a provost court as provided in the then subsisting orders of the commanding general; and it was asserted that the offense of which the petitioner had been convicted was not cognizable in the civilian courts because of the terms of the Governor's proclamation of December 7, 1941.

The petitioner, by traverse, put in issue the allegations of the answer. Thereupon the writ was issued, the petitioner was produced and evidence taken. It was stipulated that the return to the order to show cause be considered the return to the writ of habeas corpus, and that the traverse to the return to the show cause order be considered the traverse to the return to the writ. Being of opinion that the provost court was without lawful authority to try the charge, the court ordered petitioner's release from custody.

The facts in case No. 10,763 are these: Appellee Lloyd C. Duncan is a citizen of the United States living temporarily in the Territory of Hawaii, where he was in the civilian employ of the Navy Department at Pearl Harbor. On February 24, 1944, while within the limits of the naval reservation where he was employed, he assaulted and struck with his fists two marine corps sentries on duty at the main gate. Later he was summoned to appear before the provost court on the charge of assault

with intent to obstruct the sentries in the lawful performance of their official duties, contrary to paragraph 8.01 of General Orders No. 2 of the Military Governor, dated March 10, 1943. He was tried by the provost court without a jury, was found guilty of the charge and was sentenced to serve a jail term of six months. He was then delivered into the custody of appellant, the sheriff of the city and county of Honolulu, and was confined by the latter in the Honolulu jail. Petition for the writ was filed March 14, 1944, and an order to show cause served on appellant the same day.

The sheriff made a return admitting the fact of the charge and conviction. The return alleged, in substance, that the public safety has at all times since December 7, 1941, required the continued existence of martial law and the suspension of the writ as proclaimed by the Governor of the Territory; that the General Orders referred to, respecting the establishment and authority of provost courts, were necessary for the successful prosecution of the war; and that the military action of punishing persons assaulting sentries engaged in the performance of their duty, with intent to hinder such performance, was not unreasonable or arbitrary.

As in the White case, the allegations of the return were formally put in issue by traverse. After hearing argument the court issued the writ and the sheriff produced the petitioner. It was stipulated that the government's return to the order to show cause should stand as the return to the writ. There followed a trial at which testimony was taken bearing upon the truth of the situation as developed in the several pleadings. At its conclusion the court entered judgment discharging the petitioner from custody. The grounds given for the discharge were that martial law did not prevail in the Territory and that the provost court was without authority to try the petitioner.

As will later appear, there are substantial differences between these cases; but underlying each are the same fundamental questions namely, (1) whether the court was

in error in holding that the petitioner was unlawfully imprisoned, and (2) whether, in any event, the court was foreclosed from inquiring into the legality of the detention because of the suspension of the privilege of the writ. The points are discussed in the briefs in the order named. However, before considering the first point it will be convenient at the outset briefly to notice the second.

■ 1. *Availability of the writ.* In Ex parte Zimmerman, 132 F.2d 442, we held that the privilege of the writ of habeas corpus was lawfully suspended in the Territory by the Governor's proclamation of December 7, 1941, issued with approval of the President. It was thought by the trial court that the suspension was subsequently terminated by a proclamation of the Governor issued with Presidential approval on February 8, 1943.

We do not agree. Without going into the matter in detail it is for present purposes enough to say that the later proclamation was not intended to terminate the suspension and did not have that effect. However, in view of the conclusion we have reached in respect of the legality of the imprisonment in each case, it is unnecessary to consider whether the emergency existing in the Territory as of the time of the filing of the petitions was such as to warrant the then suspension of the writ. Nor, for the same reason, is it essential to inquire into the applicability of the suspension to these particular cases. Compare Ex parte Quirin, 317 U.S. 1, 24, 25, 63 S.Ct. 2, 87 L.Ed. 3. For the purpose of the decision we assume, without deciding, that the court was not disabled from entertaining the petitions.

■ 2. *Legality of the imprisonment.* The Governor's proclamation of December 7, 1941, in addition to suspending the writ, placed the Territory under martial law. The latter step, no less than the first, was authorized by the express language of § 67 of the Hawaiian Organic Act as is developed more at length in Ex parte Zimmerman, supra.[1] The step, as there said,

---

[1] So far as here pertinent, § 67 of the Organic Act provides: "The governor shall be responsible for the faithful execution of the laws of the United States and of the Territory of Hawaii within the said Territory, and whenever it becomes necessary he may call upon the commanders of the military and naval forces of the United States in the Territory of Hawaii, * * * to prevent or suppress lawless violence, invasion, insurrection, or rebellion in said Territory, and he may, in case of rebellion or invasion, or imminent danger

had the immediate approval of the President.

By the terms of the proclamation Governor Poindexter called upon the commanding general, "during the present emergency and until the danger of invasion is removed, to exercise all the powers normally exercised by me as Governor." He further authorized the commanding general, "and those subordinate military personnel to whom he may delegate such authority, during the present emergency and until the danger of invasion is removed, to exercise the powers normally exercised by judicial officers and employees of this Territory and of the counties and cities thereon, and such other and further powers as the emergency may require." The people of the Territory were admonished to obey the proclamation and such rules and orders as the commanding general might issue. Responding to the proclamation, General Short at once assumed the post and title of Military Governor, and his successor, General Emmons, did likewise.

Invocation of the military power could hardly have been more complete. As interpreted by the executive and as applied by the commanding generals, the term "martial law" was here accepted as meaning nothing less than total military government. From that time forward until March 10, 1943, the Territory appears to have continued under exclusive military rule.

By General Orders No. 4, issued December 7, 1941, General Short set up military commissions and provost courts with power "to try and determine any case involving an offense committed against the laws of the United States, the laws of the Territory of Hawaii or the rules, regulations, orders or policies of the military authorities." All civil courts were closed at that time. By General Orders No. 57,[2] issued January 27, 1942, the local courts were authorized "to exercise certain of the powers normally exercised by them during the existence of civil government." This regulation provided that "the United States District Court for the Territory of Hawaii, the Supreme Court of said Territory, and the justices thereof, the circuit courts, circuit judges at chambers, land court, juvenile court, tax appeal court and the district magistrates are hereby authorized, as agents of the Military Governor, to exercise their respective functions according to law, as it existed immediately prior to the declaration of martial law," subject to numerous restrictions. Among these were prohibitions against the exercise of jurisdiction of criminal cases and the empaneling of grand or petit juries.

The judicial status indicated by Order No. 57 appears to have persisted without material change until March, 1943. It would be a perversion of the truth to say that the courts were "open" during this period —certainly they did not function as a coordinate or independent branch of the government. So far as they were permitted to operate they did so "as agents of the Military Governor." Like existing civil officials of all grades throughout the Territory, the courts were mere instruments of the commanding general. Moreover, because of the prohibition against the assembling or empaneling of juries they were wholly disabled from trying criminal cases in the constitutional sense.

We intimate no criticism of what was done. Without doubt Governor Poindexter, the President, and the generals in command proceeded in the bona fide belief that the establishment of complete military rule was a course dictated by necessity. Nor are the courts entitled to set themselves up as boards of strategy to judge, after the event, whether the belief was warranted by the emergency.[3] Certainly they may inquire no further than to consider whether the executive proceeded on reasonable grounds.[4]

We need comment but briefly on the dangers inherent in the Hawaiian situation or on the military importance of this exposed area. The Islands form the key outpost in the nation's Western bastion of defense. As is now known, the surprise attack on Pearl Harbor was so devastating and the destruction wrought so nearly com-

---

thereof, when the public safety requires it, suspend the privilege of the writ of habeas corpus, or place the Territory or any part thereof, under martial law until communication can be had with the President and his decision thereon made known." 31 Stat. 153, § 67, 48 U.S.C.A. § 532.

[2] This order supplemented General Orders No. 29, issued December 16, 1941.

[3] Kiyoshi Hirabayashi v. United States, 320 U.S. 81, 93, 63 S.Ct. 1375, 87 L. Ed. 1774.

[4] Sterling v. Constantin, 287 U.S. 378, 53 S.Ct. 190, 77 L.Ed. 375.

plete as to put the Islands in peril of actual seizure by the task forces of a powerful and determined enemy. While immediate steps were taken to convert Hawaii into a fortress, and while the Japanese ultimately met with vigorous opposition in other parts of the Pacific, the perils which beset this strategic area did not vanish overnight. It is the opinion of responsible military and naval authorities that as late as the spring of 1944 the Islands continued in imminent danger of attack from the air, of submarine forays and commando raids from the sea.[5]

Governmental and military problems alike were complicated by the presence in the Territory of tens of thousands of citizens of Japanese ancestry besides large numbers of aliens of the same race.[6] Obviously the presence of so many inhabitants of doubtful loyalty posed a continuing threat to the public security. Among these people the personnel of clandestine landing parties might mingle freely, without detection. Thus was afforded ideal cover for the activities of the saboteur and the spy. In sum, the situation was such that informed leadership would be answerable at the bar of history if it presumed to take unnecessary chances.

But, it is said, there was no disorder in the Islands, and the courts were ready to function if only they were permitted to do so. Remembering the conditions which we have described the argument does not impress us. To function in criminal matters the civilian courts must assemble juries; and citizens of Japanese extraction could not lawfully be excluded from jury panels on the score of race—even in cases of offenses involving the military security of the Territory. Indeed the mere assembling of juries and the carrying on of protracted criminal trials might well constitute an invitation to disorder as well as an interference with the vital business of the moment. And the summary punishment of criminal offenders of every sort might conceivably serve to discourage the commission of offenses immediately endangering the general security.

▮▮ The question, then, is not whether the temporary administration of criminal justice by military tribunals was warranted by the emergency, but whether such a displacement of the judicial power can fairly be said to fall within the term "martial law," as that term is generally understood[7]—more particularly as it was employed in § 67 of the Organic Act. Presumably Congress intended to authorize the institution by the Governor, with Presidential approval, of such measures of military control as might be thought necessary to deal with any situation possible of occurrence in this remote archipelago, the turbulent history of which was fresh in the minds of the legislators. The emergency arising as the result of insurrection or invasion, or the imminent threat of either, might be of brief duration. Conceivably it might persist for a long time. If, in the latter event, it should become necessary to close or restrict the functioning of the civilian courts, the administration of ordinary criminal justice could not proceed except through the medium of military tribunals. Congress can not be thought to have intended that the suppression or punishment of crime must await the return of tranquillity or the resumption of civil authority.

The framers of the Act took verbatim from the Constitution of the Republic the provision authorizing the suspension of the writ and the placing of the Islands under martial law in the named contingencies.[8] Five years before its adoption by Congress that provision had been interpreted by the Supreme Court of the Republic in the case of In re Kalanianaole, 1895, reported in 10 Haw. 29. The decision, we think, throws important light on the intent of Congress as later given expression in the law providing for the organization of the Territory.

The case of Kalanianaole arose out of

---

[5] General Richardson and Admiral Nimitz so testified on the hearing below. They stressed, also, the various considerations outlined in this portion of the opinion.

[6] According to the record, 32.36% of the total population of Hawaii in 1940 was comprised of persons of Japanese ancestry or nativity.

[7] Consult Wiener, A Practical Manual of Martial Law (1940), 10, where the author says: "In its broad sense, martial law is the carrying on of government in domestic territory by military agencies, in whole or in part, with the consequent supersession of some or all civil agencies."

[8] The provision was contained in Article 31 of the Hawaiian Constitution.

a local insurrection which had been quickly suppressed. The courts were closed during its continuance and were not soon restored to the unobstructed exercise of their jurisdiction. Martial law had been declared by the president of the Republic and a military commission set up for the trial of such persons as might be brought before it. Kalanianaole was tried and convicted by the commission on the charge of misprision of treason, an offense denounced by a statute of the Republic and normally triable only in the civil courts. His petition for release on habeas corpus, addressed to the Supreme Court of the Republic, was denied, the court holding that he was lawfully imprisoned pursuant to the judgment of the military commission. It was thought that the setting up of the commission and the trial by it of civilian offenders was an incident of the institution of martial law, hence was impliedly authorized by Article 31 of the Constitution.[9]

We think little is to be gained by a review or an extended citation of the general authorities dealing with the subject of martial law.[10] The term "martial law" appears, indeed, incapable of exact definition.[11] It is probably just to say that the term, consistently with constitutional principles, comprehends every measure necessary to preserve the life of the state and to repel the enemy. It must not be forgotten that a cardinal purpose for which the federal constitution was set up was to "provide for the common Defence." Art. 1 § 8, cl. 1.

In Ex parte Milligan, 71 U.S. 2, 127, 4 Wall. 2, 127, 18 L.Ed. 281, the majority of the court recognized that in circumstances where the courts are actually closed there is necessity to furnish a military substitute in the administration of ordinary criminal justice for the duration of the emergency. The constitutional guarantees of indictment and trial by jury do not extend to such a situation, for, as said in Ex parte Quirin, 317 U.S. 1, 39, 63 S.Ct. 2, 16, 87 L.Ed. 3, while presentment by grand jury and trial by jury were familiar machinery for criminal trials at the time of the adoption of the Constitution, the procedures were unknown to military tribunals. "The latter," said the Court, "are usually called upon to function under conditions precluding resort to such procedures." The Court added that "it was not the purpose or effect of § 2 of Article III, read in the light of the common law, to enlarge the then existing right to a jury trial."

■ At the time appellee White was tried complete martial rule was in effect and the civil courts were disabled from functioning. The situation necessitated his trial by the military. Moreover, authority for such procedure is implicit in the act of Congress providing for the organization of the Territory.

We turn now to the case of appellee Duncan.

The legal situation in the Islands at the time of his trial differed markedly from that earlier prevailing. In January, 1943, a conference was held in Washington, participated in by Governor Stainback of the Territory, the Secretary of the Interior, the Secretary of War, and the Attorney General. The conference resulted in the issuance by Governor Stainback, on February 8, 1943, of a proclamation which had the prior approval of the President. This document proclaimed that on the thirtieth day thereafter the Governor of Hawaii and the other civilian officers and agencies of the federal, the territorial, and the

---

[9] The opinion in the case was written by Justice Frear, later Governor of the Territory.

[10] The authorities have been collected by law writers in recent articles undertaking to discuss the subject in the light of the present emergency and are readily available to the general reader. Cf. Charles Fairman, The Law of Martial Rule and the National Emergency, published in Harvard Law Review, June 1942; Archibald King, The Legality of Martial Law in Hawaii, Vol. XXX California Law Review, Number 6, September 1942. Consult generally, Wiener, A Practical Manual of Martial Law (1940).

[11] Consult, for example, the discussion of Chief Justice Chase in his concurring opinion in Ex parte Milligan, 71 U. S. 2, at page 141, 4 Wall. 2, at page 141, 18 L.Ed. 281. In important respects his definition of the term is unsatisfying. In the year 1857 Attorney General Cushing remarked on "the extreme want of preciseness" with which the subject had been discussed by common law authorities and commentators. These, he said, afforded "no clue to what martial law, as understood in England, really is;" and he observed that in this country the situation was "even worse." 8 Op. Atty. Gen. 365, 367, 368.

local governments, would resume their respective jurisdictions, functions, and powers, according to law, with respect to a very great number of matters, and others necessarily related thereto.[12] It is said that the proclamation had the effect of restoring all but a minor part of the civil authority.[13] The resumed functions included "judicial proceedings, both civil and criminal," except (1) criminal prosecutions against members of the armed forces; (2) civil suits against members of the armed forces in respect of any act or omission certified by the commanding general to be in the line of duty; and (3) criminal prosecutions for violations of military orders.

For immediate purposes, the pertinent exception to the resumption by the civil courts of full criminal powers is the one relating to "criminal prosecutions for violations of military orders." The proclamation, according to its terms, became effective March 10, 1943. On that date commanding General Richardson issued General Orders No. 2,[14] one paragraph of which provided in part that provost courts and military commissions should have jurisdiction and power to try any case involving a violation by a civilian of the rules, regulations, proclamations, or orders of the military authorities, or of the laws of war.

Paragraph 8.01 of these orders provided, in substance, that no person shall commit "an assault or an assault and battery" on any member of the military police or other military or naval personnel, "with intent to resist, prevent, hinder, or obstruct him in the discharge, execution or performance of his duties as such." No specific penalty was prescribed for a violation of the prohibition except that elsewhere in the order it is stated that the provost court will be guided, but not bound by the penalties prescribed by the laws of the Territory in like cases. It was under paragraph 8.01 that Duncan was tried in the provost court in February of the following year.

Whether this provision of General Orders No. 2 was valid as applied to civil-

ians poses a question of unusual delicacy and importance. The General Orders, as well as the proclamation of the Governor, proceeded on the express assumption that a state of martial law was to continue in effect. The proclamation, however, did not purport to render the civil authority thereafter subordinate to the military. The contrary, indeed, was to be the case in respect of all powers resumed. The courts were no longer to operate as agencies of the general in command; clearly, they were intended to function as a coordinate branch of the civil government which Congress had provided for the Territory. Thenceforward they were open. They were in full possession of the power to empanel grand and petit juries and were not in terms disabled from proceeding in the traditional manner to the trial of any criminal offense denounced by Hawaiian laws.

The first point to be noticed is that the conduct proscribed by paragraph 8.01 of the General Orders is beyond the scope of the Articles of War.[15] It affects civilians in no way connected with the military or naval forces, and therefore not normally amenable to military discipline. Again, there is no specific act of Congress authorizing the promulgation of the regulation or confirming its validity by making the violation of such a military order a criminal offense. Congressional authority can be looked for only in the provision of the Organic Act authorizing resort to martial law.

It is to be recalled that in respect of the military control of Japanese resident on the Pacific Coast, Congress felt it appropriate to denounce as a misdemeanor any infraction of the pertinent military orders relating to their control and removal; and offenders were made subject to trial exclusively in the civil courts. See Act of March 21, 1942, 56 Stat. 173, 18 U.S.C.A. § 97a; cf. Kiyoshi Hirabayashi v. United States, 320 U.S. 81, 63 S.Ct. 1375, 87 L.Ed. 1774. It is true that martial law had not formally been proclaimed in the affected area; but a state of qualified martial law nevertheless existed there more

---

[12] In passing, it is important to note a provision to the effect that "nothing in this proclamation shall operate to invalidate any conviction * * * which occurred or shall occur prior to the thirtieth day hereafter."

[13] In the trial below Governor Stainback testified that in his opinion about 95% of the civil powers were restored.

[14] These were intended as a revision of all previous general orders to conform to the changed legal situation.

[15] 10 U.S.C.A. §§ 1471–1593.

drastic, in certain of its aspects, than that prevailing in Hawaii during the period now in question. However, as later pointed out, we think it is not a necessary consequence of the congressional policy manifested in this instance that appropriate military orders affecting civilians are invalid in the absence of express legislative sanction.

The law of Hawaii defines the offense of assault and battery and prescribes penalties for its violation.[16] There is a territorial statute imposing a much heavier penalty for the commission of "an assault or an assault and battery on any public officer, civil or judicial, with intent to resist, prevent, hinder or obstruct him in the discharge or execution of his duty as such."[17] There is however, no statute punishing a battery of that aggravated nature committed upon personnel of the armed forces while acting in the line of duty; and it was the latter offense that was proscribed by the regulation under which Duncan was tried.

■ It is clear that the civil courts were without jurisdiction to try one accused of an offense of this character, unknown, as it was, to Hawaiian law. In the absence of enabling legislation their powers extended no farther than to try those accused of offenses denounced by statute. In sum, even in the absence of the prohibition contained in the Governor's proclamation, they were not competent to try Duncan for the offense with which he was here charged. It thus becomes necessary to consider whether the military were competent to define such conduct as an offense and proceed to the trial and punishment of one accused of it.

The condition of emergency existing in the Islands has already been noted. It was testified by General Richardson and by Admiral Nimitz that these conditions prevailed as late as March and April of 1944. In the opinion of these responsible commanders the danger of attack and invasion, if less serious and pressing than before, still continued imminent. They characterized the Hawaiian area as an integral part of the theatre of actual military operations in the Pacific. General

Richardson expressed the belief that the continuance of martial law, to the extent it was then effect in the Territory, was necessary not only for the safety of the Islands but for the defense of the nation. That the President and the Governor were of the same opinion is evidenced by the proclamation, one provision of which, as has been seen, contemplated the continued prosecution in the military courts of those accused of the violation of military orders.

In Kiyoshi Hirabayashi v. United States, supra, 320 U.S. at page 93, 63 S.Ct. at page 1382, 87 L.Ed. 1774, the Court observed that the war power of the national government extends to every matter and activity so related to war as substantially to affect its conduct and progress. "The power," said the Court, "is not restricted to the winning of victories in the field and the repulse of enemy forces. It embraces every phase of the national defense, including the protection of war materials and the members of the armed forces from injury and from the dangers which attend the rise, prosecution, and progress of war. [citing cases] Since the Constitution commits to the Executive and to Congress the exercise of the war power in all the vicissitudes and conditions of warfare, it has necessarily given them wide scope for the exercise of judgment and discretion in determining the nature and extent of threatened injury or danger and in the selection of the means for resisting it. [citing cases] Where, as they did here, the conditions call for the exercise of judgment and discretion and for the choice of means by those branches of the Government on which the Constitution has placed the responsibility of war-making, it is not for any court to sit in review of the wisdom of their action or substitute its judgment for theirs."

In emergencies arising out of total war there are fields in which civilian conduct is necessarily impinged upon by regulations of the military, even in areas which are not regarded as part of the theatre of actual warfare. Of this we have had during the existing emergency many familiar examples, such as regulations concerning blackouts, dimouts, curfews, and the like —all of them recognized as essential to

---

[16] Revised Laws of Hawaii 1935, C. 166, §§ 5651, 5659.

[17] Revised Laws of Hawaii 1935, c. 166, § 5657. The penalty prescribed is a fine of $1,000 or imprisonment for not more

than one year. The penalty for simple assault and battery, as prescribed by the statute relating thereto, is a fine of not more than $100 or imprisonment for not more than six months.

military security. The power to punish infractions of military regulations of this type must of necessity reside somewhere. If it has not by legislation or municipal ordinance been delegated to the ordinary courts or made subject to the authority of the civil police, the power must perforce exist in the military arm of the government acting through the medium of commissions or like tribunals.

Paragraph 8.01 of the General Orders is a regulation of this type. As seen, it had no counterpart in the statutes of the Territory. Nor was there statute or ordinance in existence making the infraction of it an offense triable in the courts. It can hardly be doubted that the provision was a reasonable measure. We are not able to say that, under the conditions shown to exist in this vital area, an assault upon a sentry or a member of the military police with intent to obstruct him in the discharge of his duty, was an offense of so little consequence to the public security that it called for no punishment at all or that its punishment in the civil courts as a simple battery was adequate to meet the needs of the hour. That Duncan's offense was of this aggravated nature the record does not admit of doubt.

Whether, in the situation prevailing in the Islands since March 1943, the military are competent to define and punish ordinary civilian offenses punishable as of course in the civilian courts is a question that is not before us.

There was nothing in the showing made in either of these cases which would warrant release on habeas corpus on grounds having to do with the fairness of the trials in the provost courts. Nor did the court below make any finding of unfairness in the conduct of the trials. The writs should have been discharged and the petitioners remanded to custody.

The judgments in both cases are reversed.

GARRECHT, Circuit Judge (concurring).

I concur in the opinion of Judge HEALY.

WILBUR, Circuit Judge (concurring). I am authorized to say that Judge MATHEWS joins me in this opinion. We concur in the opinion of Judge HEALY concerning the effect and existence of martial law in the Territory of Hawaii

and in the conclusion that the appellees should be returned to the custody of the respective appellants.

We also concur in the conclusion stated in the opinion of Judge HEALY, that the proclamations hereinafter referred to were not intended to terminate the suspension of the privilege of the writ and did not have that effect. We further hold that such changed conditions as had occurred in the Territory did not restore the right to the writ of habeas corpus. This conclusion on this matter would also require that the appellees be restored to the custody from which they were taken under the writ of habeas corpus and the orders discharging them from custody be reversed.

We deem it desirable to state this additional ground for reversal of the orders of the trial court because the undetermined nature and effect of martial law whether exercised by virtue of the necessities of war or under express authorization, constitutional or statutory, is a matter of great doubt when sought to be applied in individual instances, as in the cases at bar. The right to suspend the privilege of the writ of habeas corpus is derived directly from the Constitution of the United States. Such suspension is also authorized by the organic law of the Territory of Hawaii, and the power is sought to be broadened by that law to situations where there is imminent danger of invasion as well as actual invasion, although the two phrases are probably of identical significance when reasonably interpreted.

We now consider the rights of the appellees with reference to the suspension of the writ of habeas corpus.

The trial judge, feeling himself bound by previous decisions of the United States District Court for the Territory of Hawaii, announced that the privilege of the writ of habeas corpus was not suspended at the time of the appellees' application. This conclusion was based upon the proposition that the order suspending the privilege of the writ had been set aside by subsequent orders, as will be presently stated. Our discussion of the subject is shortened by the fact that we have already considered and decided, in Ex parte Zimmerman, 132 F.2d 442, the question as to whether or not the privilege of the writ of habeas corpus was suspended in Hawaii from and after December 7, 1941, and if so, the effect of such suspension. We there held, Judge Healy writing the opinion, that for the reason that the suspension of the writ pre-

cluded such action, the court was powerless to release from custody a citizen of the United States detained by the military authorities in Hawaiian Territory. The facts with relation to the various proclamations and orders suspending the privilege of the writ are set out in that opinion and need not be here repeated. Suffice it to say that it was there held that the Territory of Hawaii was invaded by the Japanese on the morning of December 7, 1941; that the proclamation of the Governor of the Territory of Hawaii, approved by the President of the United States, lawfully suspended the privilege of the writ as authorized by section 67 of the Organic Law of the Territory of Hawaii, passed April 30, 1900, 31 Stat. 153, 48 U.S.C.A. § 532. The Constitution of the United States, Article I, section 9, clause 2, provides: "The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." We start then with the proposition heretofore determined by this court, that the proclamation of the Governor suspending the privilege of the writ of habeas corpus and declaring martial law, approved by the President of the United States, was valid and binding on the courts. If the privilege of the writ is still suspended, then under our decision in Ex parte Zimmerman, supra, the action of the trial court must be reversed and the appellees remanded to the custody of the appellant where he had been placed by the military authorities.

The appellees' claim that the privilege of the writ of habeas corpus is no longer suspended in the Territory of Hawaii is based upon two distinct propositions: First, that it was officially ended by appropriate proclamation on February 8, 1943, and, second, that even if there was no such formal restoration as a matter of fact the necessity for martial law and the suspension of the writ has ceased and, therefore, by reason of such changed conditions martial law no longer exists and the suspension of the writ is no longer effective. We shall first consider the contention with reference to the restoration of the privilege of the writ by proclamation of February 8, 1943.

On that date the Governor of the Territory of Hawaii issued a proclamation declaring the partial suspension of martial law and it is claimed that the proclamation also, in legal effect, re-established the privilege of the writ of habeas corpus, although not specifically declared. The proclamation of February 8, after stating: "Whereas, a state of martial law remains in effect and the privilege of the writ of habeas corpus remains suspended", proceeds to restore civilian officers and agencies of the federal territorial and local governments to their "respective jurisdictions, functions and powers" concerning, among other things "judicial proceedings both criminal and civil", with certain exceptions which are not of present concern. Governor Stainback, who issued the proclamation, testified that in his opinion it restored at least 95 per cent of civil authority. That the proclamation was not intended to effect the suspension of the privilege of the writ of habeas corpus is clear from what preceded, and what was contemporaneous with, the proclamation of the Governor. The proclamation resulted from a conference held in Washington, D. C., in which the Governor of the Territory of Hawaii, the Secretary of the Interior, the Secretary of War, and the Attorney General, joined in discussions and agreements leading to the approval by the President of the proposed proclamation of February 8, 1943, and to its promulgation. In the joint letter to the President of January 18, 1943, submitting to him the agreement above referred to, it was said: "Pursuant to this agreement the Governor of Hawaii and the Commanding General will issue simultaneous proclamations. Their effect is to leave unchanged the state of martial law and the suspension of the writ of habeas corpus, to restore to the civil government the majority of civil functions hitherto exercised by the military authorities, and to provide emergency powers for the military government."

The letter of the President dated February 1, 1943, addressed to the Secretary of War, acknowledged the receipt of the proposed proclamation to be issued concurrently by the Commanding General and the Governor of Hawaii and approved the same, stating: "In an area of such strategic importance as the Hawaiian Islands in a time of active war in the Pacific, I can readily appreciate the difficulty in defining exactly the boundaries between civil and military functions. I think the formula which this proclamation applies meets the present needs."

When Governor Stainback returned to Hawaii he issued the proclamation in accordance with the agreement above referred to and concurrently therewith published a statement which, among other things, says:

"After numerous conferences among representatives of the War, Justice, Interior Departments and myself, it was agreed that martial law should be continued in Hawaii but that existing military control should be modified to restore to a large extent civilian control of civilian matters. My proclamation is the result of this agreement.

"Under the Act of Congress the Governor is 'responsible for the faithful execution of the laws of the United States and of the Territory' within the Territory. On December 7, 1941, the Governor of Hawaii issued a proclamation placing the Territory under martial law, which proclamation was subsequently modified by me on September 2nd, 1942. This proclamation issued today continues martial law and the suspension of the privilege of the writ of habeas corpus but modified those prior proclamations by restoring to the civil authorities jurisdiction in their respective fields over civilian affairs except for certain specified subjects which are primarily of military concern."

It seems perfectly clear that the Governor, who is vested with the power to declare martial law and to suspend the privilege of the writ of habeas corpus under section 67, supra, had no intention of restoring the privilege of the writ. It is a matter of doubt and undetermined whether or not the suspension of the writ, having been approved by the President and thus made an act of the President of the United States, could be restored by the unapproved action of the Governor. It is not necessary to determine this question for the reason that it is clear that the proclamation of the Governor, with the accompanying statement, shows that he had no intention of vacating the order which suspended the privilege. We conclude that so far as the proclamation of February 3, 1943, is concerned, the privilege of the writ of habeas corpus remains suspended.

As to the second point as to the effect of changed conditions, the trial court having concluded that the privilege of the writ of habeas corpus was restored by proclamation, its attention was directed to the question of the effect of the changed conditions upon the proclamation declaring martial law which had only been revoked in part by the proclamation of February 8, 1943. As to the part of the proclamation purporting to continue in force a part of martial law, the argument is that as there is no longer danger of invasion, imminent or otherwise, the necessity for martial authority in the Territory has passed; consequently, the court need no longer recognize the authority of the military to detain the appellee in custody, which was merely an incident of the necessity of martial law. (This argument is based upon the decision of the Supreme Court in Ex parte Milligan, 71 U.S. 2, 4 Wall. 2, 18 L.Ed. 281.) No case is cited and none is found in which it is held that a change of condition alone would result in the restoration of the privilege of the writ of habeas corpus. But even if such were true the record does not disclose such a situation as would justify the application of such a rule, if it exists. A great deal of the testimony was directed to the military situation in the Territory at the time of trial and the trial court found as a fact that "while the Island of Oahu may have been on March 2, 1944, and thereafter to this day, subject to possible attack by enemies at war, that it was not then, nor is it now, in imminent danger of invasion by hostile forces, neither was or is it in rebellion." The trial court found as a fact that the civil government was in efficient operation.[1]

In support of the claimed necessity for continued maintenance of partial martial law, Lieut. General Richardson of the United States Army, in command of that area, and Admiral Nimitz of the United States Navy, in charge of the naval operations through the Pacific, each testified that in his opinion the continuance of martial law was necessary in the Territory of Hawaii for the protection of the territory and of the United States. The trial

---

[1] "I find from the evidence that at all times during the year 1943 and continuing to this day, conditions were such throughout all the principal islands of the Territory of Hawaii that the regularly constituted civil government was either in efficient operation or fully capable of such operation in all its branches and ordinary departments and was sufficiently equipped, capable and willing to perform all functions for which it was created."

judge, notwithstanding their opinions and orders, concluded that there was no danger of invasion and no continued necessity for martial law and ordered the appellee released. We thus have diametrically opposed views of the situation by the General and Admiral responsible for the defense of the Hawaiian Territory, and also for the defense of the United States, and of the judge who had no responsibility therefor. Under such circumstances the question is not difficult of solution, for it has been held by our Supreme Court in Moyer v. Peabody, 212 U.S. 78, 29 S.Ct. 235, 236, 53 L.Ed. 410, decided in 1909, that the federal court had no jurisdiction of an action for false imprisonment against the Governor of the State of Colorado who had seized and imprisoned the plaintiff Moyer for 76 days and had suspended the privilege of the writ. The court said: "It is admitted, as it must be, that the governor's declaration that a state of insurrection existed is conclusive of that fact. It seems to be admitted also that the arrest alone would not necessarily have given a right to bring this suit. * . * * But it is said that a detention for so many days, alleged to be without probable cause, at a time when the courts were open, without an attempt to bring the plaintiff before them, makes a case on which he has a right to have a jury pass. * * * So long as such arrests are made in good faith and in the honest belief that they are needed in order to head the insurrection off, the governor is the final judge and cannot be subjected to an action after he is out of office, on the ground that he had not reasonable ground for his belief. * * * Public danger warrants the substitution of executive process for judicial process."

It would seem clear from this decision, as well as from principle, that the decision as to whether or not the continued suspension of the writ was necessary was one entirely for the executive authorities, if made in good faith and upon an honest belief. We shall examine that question for a moment.

Was the situation such that an executive could say that the continued suspension of the privilege of the writ of habeas corpus was necessary?

Considering this question we not only have in evidence the public acts and declarations of a military Governor and of Admiral Nimitz, who are in charge of that area, but we also have their testimony under oath in this habeas corpus proceeding. Lieutenant General Robert C. Richardson, in response to the following question gave the following answer:

"Q. Now, General Richardson, based upon your appraisal of the military situation, will you state your opinion as to whether or not there is imminent danger of invasion of this Territory by the Japanese enemy? A. I shall state from a soldier's point of view the actual reality of the situation, without attempting to argue or define the academic definition of 'imminent danger of invasion.' We know that, at least we feel quite certain that, the Japanese are totally incapable of coming to these islands with a large land-based force for the purpose of seizing and capturing it. We do not think that is within their capability at all. The time for that is past. And, therefore, if that interpretation is paramount in the mind of the layman, it may be eliminated. But you must remember that in law, as in other branches and other professions, times change. There are new developments. When that phrase was written, 'imminent danger of invasion,' nor [neither] the submarine, nor the airplane were in existence, nor were they ever dreamed of. These two new weapons of war have enormous potentialities, and they have introduced into warfare the element of stealth, the element of surprise, and the element of speed. And, therefore, capitalizing on these new elements of warfare, our enemy, the Japanese, has at his disposal today a strong carrier force, destroyers, cruisers, battleships, and airplanes, and submarines, all of which combine those elements of stealth, surprise and speed.

"Therefore, they still have the capability of launching an attack, an invasion by air, an invasion by undersea, against these islands. And they have not only the capability itself; it is always impending, as long as their capability exists, the danger impends and the danger is imminent."

Admiral Chester W. Nimitz, United States Navy, Commander-in-Chief Pacific Fleet and Pacific Ocean areas, testified as follows:

"Q. Will you state, Admiral Nimitz, in a general way the strategic position of this Territory as part of your general command? A. The Hawaiian area constitutes the only base for the Navy that we

have in the Pacific Ocean at the present time. It has the greatest importance to the fleet and to the Army for operations to the westward. Anything that is injurious to this area is prejudicial to our conduct of the war.

"Q. Do you believe, Admiral Nimitz, as a military matter or as a naval matter, that the Japanese enemy might or could attack these islands? A. Yes, they could. It is still within their capability to make carrier attacks behind the front, in spite of the daily searches that we make. We have never ceased, since December 7th, to search the areas from which we think those attacks are likely to come. Until the last Japanese carrier is destroyed, that capability will exist. * * *'

"Q. Admiral Nimitz, in addition to the possibility of an attack by carrier-based planes, are there other military factors, major factors to be considered in determining the possibility of an attack by the Japanese on this Territory? A. Yes. The Japanese can land commando raiders, espionage parties, in spite of any reasonable preventive efforts that we make. And the information that they might possibly obtain would be—in my opinion—could be more injurious to our cause than if they came to these islands and established a beachhead on one of them. The information that they might as to prospective movements of our fleet, the presence of our fleet in these waters, or its absence, the deductions that might be made from the information they pick up mingling with the Japanese of the community might very well cause some of our operations in the far west, far westward of here, to be unsuccessful.

"Q. Well, in other words, do you agree with General Richardson's testimony that protection of these Naval operations to the westward from premature disclosure is a vital factor in your operations? A. It is of the utmost importance, and the security against espionage activity in these islands is of the utmost importance.

"Q. Admiral Nimitz, having in mind your duties here and your responsibility, and from your study of the situation, would you state whether or not, in your opinion, there is imminent danger of invasion of the Territory of Hawaii by the Japanese? A. Invasion by sea-borne troops in sufficient numbers to seize a bridgehead, no. I consider it neither imminent nor probable. But invasion by stealth, by submarine, commando raids, espionage parties, I consider it not only probable but imminent. It is constantly impending.

"Q. And what is your view on invasion by carrier-borne aircraft? A. I cited that in a previous answer, that it is possible, if the Japanese wish to take the risk; they have sufficient carriers and sufficient planes to make an attack on these islands similiar to the one that they made on December 7th.

In considering the danger of surprise referred to by both the General and the Admiral, it should be noted that the testimony shows that an advantage of a few minutes may be decisive in modern warfare.[2]

The Supreme Court in Ex parte Milligan, 71 U.S. 2, 3, 4 Wall. 2, 3, 18 L.Ed. 281, was dealing with a situation in which Congress had provided that the suspension of the writ should not be effective where there was a failure to indict the petitioner within a time fixed by statute. The case, therefore, dealt not with the effect of the suspension of the writ but rather with the right to try the petitioner by military tribunal during the period in which he was held by the military authorities. The Supreme Court held that the military authorities were without jurisdiction to try the petitioner and that the decision of the military court was void for that reason, the court holding that the situation did not justify the application of martial law in violation of the expressed will of Congress to the contrary. The court in that case divided upon the question of whether or not Congress, under the Constitution, could authorize trials other than by jury under the circumstances, disclosed in that record. This decision will be of importance in weighing the effect of the judgment of the provost court in this case, a question which we hold is not before us.

Assuming as we do for the purpose of this opinion, without deciding, that the court can ignore an order suspending the privilege of the writ of habeas corpus as to persons held in custody by the military authorities when such suspension is so arbitrary, capricious and unreasonable as

[2] The report of the Navy Department of December 5, 1942, states that all the anti-aircraft guns of the naval vessels at Pearl Harbor were in action within seven minutes after the attack at 7:55 a. m.

to justify an inference of fraud on the part of the military authorities, we hold that in view of the existence of a global war in which this nation is involved and from the facts shown in evidence in the court below, the courts cannot say the decision of the military authorities or of the Governor of Hawaii to continue such suspension is so arbitrary, capricious or fraudulent as to justify the courts in ignoring the action of the military authorities and ordering the release of persons in their custody. The decision of the trial court based upon its own independent judgment of necessity for the continued suspension of the privilege of the writ of habeas corpus, while supported by direct evidence of a number of witnesses including Governor Stainback, does not go far enough to sustain its order because it ignores the opinion of the military authorities to the contrary and does not find facts justifying its order. Without a finding of implied fraud on the part of the Governor and of the military authorities the decision cannot be sustained.

The appellees also claim that even if the writ of habeas corpus has been and now is suspended within the Territory of Hawaii, such suspension does not apply to the type of offense committed by the appellee. The appellees contend that: "The Constitution contemplates a suspension of the privilege of the writ only in cases of persons engaged in aiding the rebellion or invasion." The Constitution provides no such limitation and we see no reason for its application. Such an interpretation of the Constitution would leave open the question in every case as to whether or not the conduct of the persons detained by the military authorities came within the exception.

The decisions should be reversed and the trial court directed to return the appellees to the custody of the respective appellants.

DENMAN, Circuit Judge.

I concur in the orders for the discharge of the writs but dissent from deciding the constitutional question of the jurisdiction or power of the court to issue the writs. This is because the petitions for the writs on their faces fail to show the petitioners belong to the class of persons entitled to the constitutional privilege of the writ of habeas corpus—that is, those alleging their illegal imprisonment.[1] These clearly are cases in which should be applied the principle that, if possible, a case must be decided on other than constitutional grounds.

The constitutional question presented in the appellants' points on appeal in both cases is stated as follows:

"I. The pleadings[2] consisting of the petition for a writ, order to show cause why a writ should not issue, the return and answer to the petition, to the order to show cause and to the return, and the traverse disclose that the privilege of the writ of habeas corpus was lawfully suspended and martial law lawfully existed pursuant to public proclamations of the Governor of the Territory of Hawaii issued pursuant to the Organic Act of the Territory; * * * *"

In Judge WILBUR'S opinion the constitutional question so presented as to whether the military orders legally deprived the appellees of the privilege of the writ is not only entertained but decided in favor of the appellants. In Judge HEALY'S opinion it is assumed that the constitutional question is decided adversely to the appellants. If his excellent opinion could be construed as holding the

---

[1] 28 U.S.C.A. § 455. "Allowance and direction. The court, or justice, or judge to whom such application is made shall forthwith award a writ of habeas corpus, unless it appears from the petition itself that the party is not entitled thereto. The writ shall be directed to the person in whose custody the party is detained."

[2] It is suggested the petitions become functus officio on the issue of the writs. It was stipulated in the Duncan case that the return to the order to show cause made before the writ was issued shall be deemed a return to the writ. In such a situation the issue is fixed by the petition for the writ and the return

to the writ which here joins issue with the petition. Whitten v. Tomlinson, 160 U.S. 231, 242, 16 S.Ct. 297, 40 L.Ed. 406. Cf. Hammerer v. Huff, 71 App.D. C. 246, 110 F.2d 113, 114, 115. A similar stipulation was made in the White case, where the return to the writ also expressly admits some of the allegations of the petition and denies others, particularly its assertion that no danger of invasion existed. In no sense could it be said that the petition became functus officio on the issuance of the writ. I do not believe Barth v. Clise, 12 Wall. 400, 402, 20 L.Ed. 393, so holds. If it does, it is overruled by Whitten v. Tomlinson, supra.

constitutional question entirely ignored, I would concur in it.

It is my view that the petitions on their faces, taken in connection with facts judicially to be noticed, show no facts invoking the jurisdiction or power of the District Court to issue the writs; that the court should have proceeded no further than to determine that it had no such power; and that it was error in both cases to proceed with hearings on the orders to show cause —all the more so to decide or assume the decision of the question of the existence of the right in the respective petitioners to the constitutional privilege of the writ.

Briefly stated, the fatal defects of the petitions in both cases are that they rest on the assertions, later more fully considered, that no danger of invasion actually existed at any pertinent times warranting the suspension of the writ, whereas there is no allegation of the sole fact necessary to sustain the petitions, namely, that at none of the pertinent times did the military authorities have *reasonable grounds to believe* the existence of such danger. As later discussed, the military could have such a belief though no such danger in fact existed. Incidentally, though it seems irrelevant, petitioners did not mend their holds by later pleading. No such allegation appears in the traverses to the returns to the orders to show cause.

Merely because persons are imprisoned does not *prima facie* give them the right to invoke the power of the court or judge to issue writs of habeas corpus in their behalf. Ex parte Quirin, 317 U.S. 24, 63 S. Ct. 2, 87 L.Ed. 3. The class of persons to whom the constitutional privilege is extended consists of those *"unlawfully* deprived of their liberty."[3] The petitions on which the instant proceedings rest on their faces show the petitioners are imprisoned on judgments military in character, not unlawful when made nor since become unlawful. The petitions no more show the petitioners belonging to the class having legal interests entitling them to raise the question of the military orders denying to them their constitutional privilege of the writ, than the litigants in many cases have brought themselves within the class having legal interests entitling them to a decision of other constitutional questions. Board of Trade of City of Chicago

v. Olsen, 262 U.S. 1, 43, 43 S.Ct. 470, 67 L.Ed. 839; Blair v. United States, 250 U.S. 273, 279, 39 S.Ct. 468, 63 L. Ed. 979; Plymouth Coal Co. v. Pennsylvania, 232 U.S. 531, 545, 34 S.Ct. 359, 58 L.Ed. 713; Municipal Investors Ass'n v. Birmingham, 316 U.S. 153, 155, 62 S.Ct. 975, 86 L.Ed. 1341.

*White's petition fails to state a cause for the issuance of the writ.* White's petition alleges that he was convicted by the Provost Marshal's court of the crime of embezzlement and sentenced to five years' imprisonment in Oahu Prison, where he is confined in the custody of appellant, respondent below. The conviction was on August 25, 1942, within three months of the Battle of Midway, in which engagement two or more large fleets of Japanese war vessels steaming toward the Hawaiian Islands were defeated near the Island of Midway. It could not be contended that there was no Japanese Navy left for a second attempt to invade the Hawaiian Islands.

It is further alleged that on December 7, 1941, the Governor of Hawaii had declared martial law and authorized the Commanding General of the Hawaiian department and his subordinates to exercise the powers normally exercised by the judicial officers of the Territory. It is not contended that this order was invalid when made, Ex parte Zimmerman, 132 F.2d 443, but a mere conclusion of law is stated "that said martial law ceased to exist legally in the Territory prior to said August 25, 1942, when he was tried as aforesaid before said Provost Court."

The petition does not and could not allege that the civil courts were open and functioning at the time of trial and sentence, but alleges no more than that they were able and ready to perform their normal functions and duties. As showing the fact supporting the legal conclusion that "martial law [had] ceased to exist legally," it is further alleged that no "such imminent danger of invasion by an enemy force existed as to warrant or justify the denial to petitioner of a trial and hearing before the proper courts in and of the Territory of Hawaii."

As stated, what makes the petition fatally defective[4] is the absence of any allega-

---

[3] As stated in McNally v. Hill, Warden, 293 U.S. 131, 138, 55 S.Ct. 24, 27, 79 L.Ed. 238, "Without restraint of liberty, the writ will not issue. * * * Equal-

ly, without restraint which is unlawful, the writ may not be used."

[4] This court in Ex parte Zimmerman, 132 F.2d 442, 446, a case involving the

tion that at the time of the trial and conviction on August 25, 1942, the military authorities had no reasonable ground to anticipate or believe that there was a danger of invasion or other military necessity requiring the exercise of all the judicial powers by the military and the denial of the exercise of any judicial power by the civil authorities.

All that is alleged is that in the after-wisdom of March 31, 1944, nineteen months later, no such danger of invasion or military necessity for the exercise by the military of judicial power over nonmilitary offenses *in fact existed on August 25, 1942.* It is entirely possible that history will show that long before the petitions were filed the Japanese military authorities regarded the invasion of the Hawaiian Islands as impossible and never entertained it at any of the times pertinent to the issues of the petitions.

However, no such after-wise allegations, even if assumed to state the facts, can satisfy the requirement of the allegation of the absence of reasonable ground in the mind of the military commander to apprehend the likelihood of the need to prepare to resist and to resist such an invasion and of the need of such judicial control during such preparation and resistance. Kiyoshi Hirabayashi v. United States, 320 U.S. 81, 94, 63 S.Ct. 1375, 87 L.Ed. 1774; Sterling v. Constantin, 287 U.S. 378, 399, 402, 53 S.Ct. 190, 77 L.Ed. 375.

Concerning the absence of written notice of the charge of embezzlement, I am in agreement with Judge HEALY'S statement. In addition no prejudice is shown and, since the evidence is not before us, we may assume that the petitioner himself testified to facts warranting his conviction. Likewise, I am in agreement with Judge HEALY'S statement regarding the absence of a jury and the character of martial as distinguished from the law of civil courts. White's petition on its face shows no ground for the issuance of the writ of habeas corpus and should have been dismissed on that ground alone.

*Duncan's petition fails to state grounds to invoke the privilege of the writ of habeas corpus.* Duncan was convicted on March 2, 1944, of having assaulted, on February 24, 1944, sentries at the main gate of the Pearl Harbor Reservation, while on the Reservation. Here I am in agreement with Judge Healy's statement. In addition judicial notice is taken that in time of war military necessity requires the fullest respect be shown to all soldiers in uniform in the performance of their military duties, *a fortiori* to the Marine sentries guarding the entrance to Pearl Harbor with its fortifications subject to possible sabotage. Equally clear is the military necessity for prompt punishment by the military itself for the maintenance of its discipline and the self-respect of its members and for the command of that respect by civilians.

Duncan's petition contains allegations similar to those of White's petition concerning the absence of danger of invasion and the military necessity for such exercise of the judicial power by the military. Nowhere are the required allegations of absence of reasonable apprehension of invasion or the absence of reasonable belief of the military necessity for military adjudication of such an offense as assaulting the sentries as here committed. As stated, it affirmatively appears that such military necessity existed.

The petition for the writ should have been dismissed because stating no cause for the granting of the claimed constitutional privilege. It was error to proceed beyond this and permit the pleadings and proof and issuance of the writ which should have been discharged for no other reason than that last above stated.

STEPHENS, Circuit Judge, did not participate in the decision of these cases.

---

same question, in holding that the petition failed to state facts empowering the district court to issue the writ, stated the rule as " * * * It is true that the averments of petitions for this great writ are not scrutinized with technical nicety; but neither are they taken as importing something other than what they say. The courts, in circumstances like the present, ought to be careful to avoid idle or captious inference."

The petition is not an inartificially drawn document prepared by a petition-er unskilled in the law, but the product of able members of the Honolulu bar. In my opinion, the reason for the absence of any allegation that, on August 25, 1942, the military could not reasonably have entertained the idea of a possible invasion for which they must be prepared and on guard, and thus bring the petition within the Hirabayashi case, infra, is because such responsible members of the bar knew such an allegation would be untrue.