## DUNCAN v. KAHANAMOKU, SHERIFF.

NO. 14.

Argued December 7, 1945.—Decided February 25, 1946.

*J. Garner Anthony* argued the cause and filed a brief for petitioner in No. 14. *Osmond K. Fraenkel* argued the cause, and *Fred Patterson* filed a brief, for petitioner in No. 15.

*Edward J. Ennis* argued the cause for respondents. With him on the brief were *Solicitor General McGrath, The Judge Advocate General of the Army, Ralph F. Fuchs, William J. Hughes, Jr., Eugene V. Slattery* and *Angus Taylor*.

By special leave of Court, *C. Nils Tavares,* Attorney General of Hawaii, argued the cause for the Bar Association of Hawaii et al., as *amici curiae,* urging reversal. With him on the brief were *Heaton L. Wrenn* and *J. Russell Cades*.

*Bartley C. Crum, Edwin Borchard, Thurman Arnold, Pierce Butler, Winthrop Wadleigh, Osmond K. Fraenkel* and *Arthur Garfield Hays* filed a brief for the American Civil Liberties Union, as *amicus curiae*, in support of petitioners.

MR. JUSTICE BLACK delivered the opinion of the Court.

The petitioners in these cases were sentenced to prison by military tribunals in Hawaii. Both are civilians. The question before us is whether the military tribunals had power to do this. The United States district court for Hawaii in habeas corpus proceedings held that the military tribunals had no such power and ordered that they be set free. The circuit court of appeals reversed, and ordered that the petitioners be returned to prison. 146 F. 2d 576. Both cases thus involve the rights of individuals charged with crime and not connected with the armed forces to have their guilt or innocence determined in courts of law which provide established procedural safeguards, rather than by military tribunals which fail to afford many of these safeguards. Since these judicial safeguards are prized privileges of our system of government we granted certiorari.

The following events led to the military tribunals' exercise of jurisdiction over the petitioners. On December 7, 1941, immediately following the surprise air attack by the Japanese on Pearl Harbor, the Governor of Hawaii by proclamation undertook to suspend the privilege of the writ of habeas corpus and to place the Territory under "martial law." Section 67 of the Hawaiian Organic Act, 31 Stat. 141, 153,[1] authorizes the Territorial Governor to

---

[1] "That the governor shall be responsible for the faithful execution of the laws of the United States and of the Territory of Hawaii within the said Territory, and whenever it becomes necessary he may call upon the commanders of the military and naval forces of the United States in the Territory of Hawaii, or summon the posse comitatus, or

take this action "in case of rebellion or invasion, or imminent danger thereof, when the public safety requires it . . ." His action was to remain in effect only "until communication can be had with the President and his decision thereon made known." The President approved the Governor's action on December 9th.[2] The Governor's proclamation also authorized and requested the Commanding General, "during the . . . emergency and until danger of invasion is removed, to exercise all the powers normally exercised" by the Governor and by the "judicial officers and employees of this territory."

Pursuant to this authorization the commanding general immediately proclaimed himself Military Governor and undertook the defense of the Territory and the maintenance of order. On December 8th, both civil and criminal courts were forbidden to summon jurors and witnesses and to try cases. The Commanding General established military tribunals to take the place of the courts. These were to try civilians charged with violating the laws of the United States and of the Territory, and rules, regulations, orders or policies of the Military Government. Rules of evidence and procedure of courts of law were not to control the military trials. In imposing penalties the mili-

---

call out the militia of the Territory to prevent or suppress lawless violence, invasion, insurrection, or rebellion in said Territory, and he may, in case of rebellion or invasion, or imminent danger thereof, when the public safety requires it, suspend the privilege of the writ of habeas corpus, or place the Territory, or any part thereof, under martial law until communication can be had with the President and his decision thereon made known."

[2] The district court heard much evidence and from it found as follows on this subject: "By radio the Governor of Hawaii on December 7, 1941, notified the President of the United States simply that he had placed the Territory under martial law and suspended the writ. The President's approval was requested and it was granted by radio on December 8, 1941. Not until 1943 was the text of the Governor's December 7 proclamation furnished Washington officials, and it is still doubtful if it has yet been seen by the President."

tary tribunals were to be "guided by, but not limited to the penalties authorized by the courts martial manual, the laws of the United States, the Territory of Hawaii, the District of Columbia, and the customs of war in like cases." The rule announced was simply that punishment was to be "commensurate with the offense committed" and that the death penalty might be imposed "in appropriate cases." Thus the military authorities took over the government of Hawaii. They could and did, by simply promulgating orders, govern the day to day activities of civilians who lived, worked, or were merely passing through there. The military tribunals interpreted the very orders promulgated by the military authorities and proceeded to punish violators. The sentences imposed were not subject to direct appellate court review, since it had long been established that military tribunals are not part of our judicial system. *Ex parte Vallandigham,* 1 Wall. 243. The military undoubtedly assumed that its rule was not subject to any judicial control whatever, for by orders issued on August 25, 1943, it prohibited even accepting of a petition for writ of habeas corpus by a judge or judicial employee or the filing of such a petition by a prisoner or his attorney. Military tribunals could punish violators of these orders by fine, imprisonment or death.

White, the petitioner in No. 15, was a stockbroker in Honolulu. Neither he nor his business was connected with the armed forces. On August 20, 1942, more than eight months after the Pearl Harbor attack, the military police arrested him. The charge against him was embezzling stock belonging to another civilian in violation of Chapter 183 of the Revised Laws of Hawaii. Though by the time of White's arrest the courts were permitted "as agents of the Military Governor" to dispose of some non-jury civil cases, they were still forbidden to summon jurors and to exercise criminal jurisdiction. On August

22nd, White was brought before a military tribunal designated as a "Provost Court." The "Court" orally informed him of the charge. He objected to the tribunal's jurisdiction but the objection was overruled. He demanded to be tried by a jury. This request was denied. His attorney asked for additional time to prepare the case. This was refused. On August 25th he was tried and convicted. The tribunal sentenced him to five years imprisonment. Later the sentence was reduced to four years.

Duncan, the petitioner in No. 14, was a civilian shipfitter employed in the Navy Yard at Honolulu. On February 24, 1944, more than two years and two months after the Pearl Harbor attack, he engaged in a brawl with two armed Marine sentries at the yard. He was arrested by the military authorities. By the time of his arrest the military had to some extent eased the stringency of military rule. Schools, bars and motion picture theatres had been reopened. Courts had been authorized to "exercise their normal jurisdiction." They were once more summoning jurors and witnesses and conducting criminal trials. There were important exceptions, however. One of these was that only military tribunals were to try "Criminal prosecutions for violations of military orders." [3] As the record shows, these military orders still covered a wide range of day to day civilian conduct. Duncan was charged with violating one of these orders, paragraph 8.01, Title 8, of General Order No. 2, which prohibited assault on military or naval personnel with intent to resist or hinder them in

---

[3] In addition, § 3 of a Proclamation of February 8, 1943, which returned some power to the civil authorities, had reserved a right in the Military Governor to resume any or all of the powers returned to the civilian government. In approving this Proclamation the President had expressed his confidence that the Military would "refrain from exercising . . . authority over . . . normally civil functions" and his hope that there would "be a further restoration of civil authority as and when the situation permits."

the discharge of their duty. He was, therefore, tried by a military tribunal rather than the territorial court, although the general laws of Hawaii made assault a crime. Revised L. H. 1935, ch. 166. A conviction followed and Duncan was sentenced to six months imprisonment.

Both White and Duncan challenged the power of the military tribunals to try them by petitions for writs of habeas corpus filed in the district court for Hawaii on March 14 and April 14, 1944, respectively. Their petitions urged both statutory and constitutional grounds. The court issued orders to show cause. Returns to these orders contended that Hawaii had become part of an active theatre of war constantly threatened by invasion from without; that the writ of habeas corpus had therefore properly been suspended and martial law had validly been established in accordance with the provisions of the Organic Act; that consequently the district court did not have jurisdiction to issue the writ; and that the trials of petitioners by military tribunals pursuant to orders by the Military Governor issued because of military necessity were valid. Each petitioner filed a traverse to the returns, which traverse challenged among other things the suspension of habeas corpus, the establishment of martial law and the validity of the Military Governor's orders, asserting that such action could not be taken except when required by military necessity due to actual or threatened invasion, which even if it did exist on December 7, 1941, did not exist when the petitioners were tried; and that, whatever the necessity for martial law, there was no justification for trying them in military tribunals rather than the regular courts of law. The district court, after separate trials, found in each case, among other things, that the courts had always been able to function but for the military orders closing them, and that consequently there was no military necessity for the trial of petitioners by military tribunals rather than regu-

lar courts.[4] It accordingly held the trials void and ordered the release of the petitioners.

The circuit court of appeals, assuming without deciding that the district court had jurisdiction to entertain the petitions, held the military trials valid and reversed the ruling of the district court. 146 F. 2d 576. It held that the military orders providing for military trials were fully authorized by § 67 of the Organic Act and the Governor's actions taken under it. The court relied on that part of the section which, as we have indicated, authorizes the Governor with the approval of the President to proclaim "martial law" whenever the public safety requires it. The circuit court thought that the term "martial law" as used in the Act denotes among other things the establishment of a "total military government" completely displacing or subordinating the regular courts, that the decision of the executive as to what the public safety requires must be sustained so long as that decision is based on reasonable grounds and that such reasonable grounds did exist.

In presenting its argument before this Court the Government for reasons set out in the margin [5] abandons its contention as to the suspension of the writ of habeas corpus and advances the argument employed by the circuit court for sustaining the trials and convictions of the petitioners by military tribunals. The petitioners contend that "martial law" as provided for by § 67 did not authorize the military to try and punish civilians such as petitioners and urge further that if such authority should

---

[4] We do not set out the other grounds of challenge since under the view we take we do not reach them.

[5] The Government points out that since the privilege of the writ was restored and martial law terminated by Presidential Proclamation on October 24, 1944, petitioners are entitled to their liberty if the military tribunals were without jurisdiction to try them. We therefore do not pass upon the validity of the order suspending the privilege of habeas corpus or the power of the military to detain persons under other circumstances and conditions.

be inferred from the Organic Act, it would be unconstitutional. We need decide the constitutional question only if we agree with the Government that Congress did authorize what was done here.

Did the Organic Act during the period of martial law give the armed forces power to supplant all civilian laws and to substitute military for judicial trials under the conditions that existed in Hawaii at the time these petitioners were tried? The relevant conditions, for our purposes, were the same when both petitioners were tried. The answer to the question depends on a correct interpretation of the Act. But we need not construe the Act, insofar as the power of the military might be used to meet other and different conditions and situations. The boundaries of the situation with reference to which we do interpret the scope of the Act can be more sharply defined by stating at this point some different conditions which either would or might conceivably have affected to a greater or lesser extent the scope of the authorized military power. We note first that at the time the alleged offenses were committed the dangers apprehended by the military were not sufficiently imminent to cause them to require civilians to evacuate the area or even to evacuate any of the buildings necessary to carry on the business of the courts. In fact, the buildings had long been open and actually in use for certain kinds of trials. Our question does not involve the well-established power of the military to exercise jurisdiction over members of the armed forces,[6] those directly connected with such forces,[7] or enemy belligerents, prisoners of war, or others charged

---

[6] *Wilkes* v. *Dinsman*, 7 How. 89; *Ex parte Reed*, 100 U. S. 13; *Martin* v. *Mott*, 12 Wheat. 19; *In re Grimley*, 137 U. S. 147; *Johnson* v. *Sayre*, 158 U. S. 109; *Carter* v. *McClaughry*, 183 U. S. 365.

[7] *Ex parte Gerlach*, 247 F. 616; *Ex parte Falls*, 251 F. 415; *Ex parte Jochen*, 257 F. 200; *Hines* v. *Mikell*, 259 F. 28. See cases and statutes collected and discussed in Underhill, *infra*, note 11, 12 Cal. L. Rev. 81–98.

with violating the laws of war.[8] We are not concerned with the recognized power of the military to try civilians in tribunals established as a part of a temporary military government over occupied enemy territory or territory regained from an enemy where civilian government cannot and does not function.[9] For Hawaii since annexation has been held by and loyal to the United States. Nor need we here consider the power of the military simply to arrest and detain civilians interfering with a necessary military function at a time of turbulence and danger from insurrection or war.[10] And finally, there was no specialized effort of the military, here, to enforce orders which related only to military functions, such as, for illustration, curfew rules or blackouts. For these petitioners were tried before tribunals set up under a military program which took over all government and superseded all civil laws and courts. If the Organic Act, properly interpreted, did not give the armed forces this awesome power, both petitioners are entitled to their freedom.

### I.

In interpreting the Act we must first look to its language. Section 67 makes it plain that Congress did in-

[8] *Ex parte Quirin*, 317 U. S. 1; *In re Yamashita*, 327 U. S. 1. See 10 U. S. C. §§ 1553, 1554. See also cases and statutes collected and discussed in Underhill, *infra*, note 11, 12 Cal. L. Rev. 81–98.

[9] *Cross* v. *Harrison*, 16 How. 164; *Leitensdorfer* v. *Webb*, 20 How. 176; *The Prize Cases*, 2 Black 635; *Mrs. Alexander's Cotton*, 2 Wall. 404; *Ford* v. *Surget*, 97 U. S. 594, 604; *New Orleans* v. *Steamship Co.*, 20 Wall. 387, 393; *Dow* v. *Johnson*, 100 U. S. 158, 166; *The Grapeshot*, 9 Wall. 129; *Mechanics' & Traders' Bank* v. *Union Bank*, 22 Wall. 276. Nor is this a case where violators of military orders are to be tried by regular courts. Cf. *Hirabayashi* v. *United States*, 320 U. S. 81.

[10] *Moyer* v. *Peabody*, 212 U. S. 78; *Ex parte Milligan*, 4 Wall. 2, 125, 126; *Luther* v. *Borden*, 7 How. 1, 45, 46; see *Sterling* v. *Constantin*, 287 U. S. 378, 400; Fairman, The Law of Martial Rule, Chicago 1943, 209–218.

tend the Governor of Hawaii, with the approval of the President, to invoke military aid under certain circumstances. But Congress did not specifically state to what extent the army could be used or what power it could exercise. It certainly did not explicitly declare that the Governor in conjunction with the military could for days, months or years close all the courts and supplant them with military tribunals. Cf. *Coleman* v. *Tennessee,* 97 U. S. 509, 514. If a power thus to obliterate the judicial system of Hawaii can be found at all in the Organic Act, it must be inferred from § 67's provision for placing the Territory under "martial law." But the term "martial law" carries no precise meaning. The Constitution does not refer to "martial law" at all and no Act of Congress has defined the term. It has been employed in various ways by different people and at different times. By some it has been identified as "military law" limited to members of, and those connected with, the armed forces. Others have said that the term does not imply a system of established rules but denotes simply some kind of day to day expression of a general's will dictated by what he considers the imperious necessity of the moment. See *United States* v. *Diekelman,* 92 U. S. 520, 526. In 1857 the confusion as to the meaning of the phrase was so great that the Attorney General in an official opinion had this to say about it: "The common law authorities and commentators afford no clue to what martial law, as understood in England, really is . . . In this country it is still worse." 8 Op. Atty. Gen. 365, 367, 368. What was true in 1857 remains true today.[11] The language of § 67

---

[11] For discussions of the great contrast of views see the following writings: Fairman, *supra,* Ch. II; Wiener, A Practical Manual of Martial Law, Harrisburg 1940, Ch. 1; Military Aid to the Civil Power, Fort Leavenworth 1925, pp. 230–232; Underhill, *Jurisdiction of Military Tribunals in the United States over Civilians* (1924) 12 Cal. L. Rev. 75, 163–178; Ballentine, *Qualified Martial Law* (1915) 14 Mich. L. Rev. 102, 203, 204; Max Radin, *Martial Law and the State of Siege* (1942) 30 Cal. L. Rev. 634.

thus fails to define adequately the scope of the power given to the military and to show whether the Organic Act provides that courts of law be supplanted by military tribunals.

## II.

Since the Act's language does not provide a satisfactory answer, we look to the legislative history for possible further aid in interpreting the term "martial law" as used in the statute. The Government contends that the legislative history shows that Congress intended to give the armed forces extraordinarily broad powers to try civilians before military tribunals. Its argument is as follows: That portion of the language of § 67 which prescribes the prerequisites to declaring martial law is identical with a part of the language of the original Constitution of Hawaii. Before Congress enacted the Organic Act the supreme court of Hawaii had construed that language as giving the Hawaiian President power to authorize military tribunals to try civilians charged with crime whenever the public safety required it. *In re Kalanianaole,* 10 Hawaii 29. When Congress passed the Organic Act it simply enacted the applicable language of the Hawaiian Constitution and with it the interpretation of that language by the Hawaiian supreme court.

In disposing of this argument we wish to point out at the outset that even had Congress intended the decision in the *Kalanianaole* case to become part of the Organic Act, that case did not go so far as to authorize military trials of the petitioners for these reasons. There the defendants were insurrectionists taking part in the very uprising which the military were to suppress, while here the petitioners had no connection with any organized resistance to the armed forces or the established government. If, on the other hand, we should take the *Kalanianaole* case to authorize the complete supplanting of courts by military

tribunals, we are certain that Congress did not wish to make that case part of the Organic Act. For that case did not merely uphold military trials of civilians but also held that courts were to interfere only when there was an obvious abuse of discretion which resulted in cruel and inhuman practices or the establishment of military rule for the personal gain of the President and the armed forces. But courts were not to review whether the President's action, no matter how unjustifiable, was necessary for the public safety. As we shall indicate later, military trials of civilians charged with crime, especially when not made subject to judicial review, are so obviously contrary to our political traditions and our institution of jury trials in courts of law, that the tenuous circumstance offered by the Government can hardly suffice to persuade us that Congress was willing to enact a Hawaiian supreme court decision permitting such a radical departure from our steadfast beliefs.[12]

Partly in order to meet this objection the Government further contends that Congress, in enacting the *Kalanianaole* case, not only authorized military trials of civilians in Hawaii, but also could and intended to provide that "martial law" in Hawaii should not be limited by the United States Constitution or by established constitutional practice. But when the Organic Act is read as a whole and in the light of its legislative history it becomes clear that Congress did not intend the Constitution to have a limited application to Hawaii. Along with § 67 Congress enacted § 5 of the Organic Act which provides "that the Constitution . . . shall have the same force and effect within the said Territory as elsewhere in the United States . . ." 31 Stat. 141. Even when Hawaii

---

[12] We point out in this connection that by § 83 of the Organic Act Congress provided how juries should be constituted and provided for the drawing of grand juries and for unanimous jury verdicts in criminal cases. 31 Stat. 141, 157.

was first annexed Congress had provided that the Territory's existing laws should remain in effect unless contrary to the Constitution. 30 Stat. 750. And the House Committee Report in explaining § 5 of the Organic Act stated: "Probably the same result would obtain without this provision under section 1891, chapter 1, Title XXIII, of the Revised Statutes, *but to prevent possible question,* the section is inserted in the bill." [13] (Italics supplied.) Congress thus expressed a strong desire to apply the Constitution without qualification.

It follows that civilians in Hawaii are entitled to the constitutional guarantee of a fair trial to the same extent as those who live in any other part of our country. We are aware that conditions peculiar to Hawaii might imperatively demand extraordinarily speedy and effective measures in the event of actual or threatened invasion. But this also holds true for other parts of the United States. Extraordinary measures in Hawaii, however necessary, are not supportable on the mistaken premise that Hawaiian inhabitants are less entitled to constitutional protection than others. For here Congress did not in the Organic Act exercise whatever power it might have

---

[13] *Government for the Territory of Hawaii,* H. Rep. No. 305, 56th Cong., 1st Sess., p. 10. In the House, Representative Knox, the Republican leader for the bill, stated: "This bill, in so many words, extends the Constitution to Hawaii; so that there has not been practically a moment of time since the Hawaiian Islands were annexed to the United States that the Constitution has not been the standard by which all the laws of that country must be measured . . . *The decisions of the Supreme Court of the United States will be equally operative in Hawaii as in any portion of the United States as to any constitutional right which he possesses.*" 33 Cong. Rec. 3704, 3709 (1900). See the following decisions of this Court relating to the applicability of the Constitution to United States Territories. *Hawaii* v. *Mankichi,* 190 U. S. 197; *Rassmussen* v. *United States,* 197 U. S. 516; *Farrington* v. *Tokushige,* 273 U. S. 284. See also Frank, *Ex parte Milligan* v. *The Five Companies: Martial Law in Hawaii* (1944) 44 Col. L. Rev. 639, 658–660.

had to limit the application of the Constitution. Cf. *Hawaii* v. *Mankichi,* 190 U. S. 197. The people of Hawaii are therefore entitled to constitutional protection to the same extent as the inhabitants of the 48 States. And Congress did not enact the Hawaiian supreme court's decision in the *Kalanianaole* case and thus authorize the military trials of petitioners. Whatever power the Organic Act gave the Hawaiian military authorities, such power must therefore be construed in the same way as a grant of power to troops stationed in any one of the States.

### III.

Since both the language of the Organic Act and its legislative history fail to indicate that the scope of "martial law" in Hawaii includes the supplanting of courts by military tribunals, we must look to other sources in order to interpret that term. We think the answer may be found in the birth, development and growth of our governmental institutions up to the time Congress passed the Organic Act. Have the principles and practices developed during the birth and growth of our political institutions been such as to persuade us that Congress intended that loyal civilians in loyal territory should have their daily conduct governed by military orders substituted for criminal laws, and that such civilians should be tried and punished by military tribunals? Let us examine what those principles and practices have been, with respect to the position of civilian government and the courts and compare that with the standing of military tribunals throughout our history.

People of many ages and countries have feared and unflinchingly opposed the kind of subordination of executive, legislative and judicial authorities to complete military rule which, according to the Government, Congress has authorized here. In this country that fear has become part of our cultural and political institutions. The story of that development is well known and we see no

need to retell it all. But we might mention a few pertinent incidents. As early as the 17th Century our British ancestors took political action against aggressive military rule. When James I and Charles I authorized martial law for purposes of speedily punishing all types of crimes committed by civilians the protest led to the historic Petition of Right [14] which in uncompromising terms objected to this arbitrary procedure and prayed that it be stopped and never repeated.[15] When later the American colonies declared their independence one of the grievances listed by Jefferson was that the King had endeavored to render the military superior to the civil power. The executive and military officials who later found it necessary to utilize the armed forces to keep order in a young and turbulent nation, did not lose sight of the philosophy embodied in the Petition of Right and the Declaration of Independence, that existing civilian government and especially the courts were not to be interfered with by the exercise of military power. In 1787, the year in which the Constitution was formulated, the Governor of Massachusetts Colony used the militia to cope with Shay's Rebellion. In his instructions to the Commander of the troops the Governor listed the "great objects" of the mission. The troops were to "protect the judicial courts . . .," "to assist the civil magistrates in executing the laws . . .," and to "aid them in apprehending the disturbers of the public peace . . ." The Commander was to consider himself "constantly as under the direction of the civil officer, saving where any armed force shall appear and oppose . . . [his] marching to execute these orders." [16] President Washington's in-

---

[14] 3 Chas. I, c. 1.

[15] Hallam, Constitutional History, (2d ed.) Vol. I, c. VII, pp. 531, 532, 533. See also discussions in dissent in *Luther* v. *Borden,* 7 How. 1, 48, 63; *In re McDonald,* 49 Mont. 454, 468, 143 P. 947.

[16] Federal Aid in Domestic Disturbances, Senate Document No. 263, 67th Cong., 2d Sess., 10.

structions to the Commander of the troops sent into Pennsylvania to suppress the Whiskey Rebellion of 1794 were to the same effect. The troops were to see to it that the laws were enforced and were to deliver the leaders of armed insurgents to the regular courts for trial. The President admonished the Commanding General "that the judge can not be controlled in his functions . . ." [17] In the many instances of the use of troops to control the activities of civilians that followed, the troops were generally again employed merely to aid and not to supplant the civilian authorities. [18] The last noteworthy incident before the enactment of the Organic Act was the rioting that occurred in the spring of 1899 at the Coeur d'Alene mines of Shoshone County, Idaho. The President ordered the regular troops to report to the Governor for instructions and to support the civil authorities in preserving the peace. Later the State Auditor as agent of

[17] *Id.* pp. 31, 32. See also on the same subject the dissent in *Luther* v. *Borden, supra,* 7 How. at 77–81.

[18] This appears from the facts related throughout Senate Document No. 263, 67th Cong., 2d Sess., *supra.*

After the passing of the Organic Act disturbances in the coal fields of West Virginia, a longshoremen's strike in Galveston and a packers' strike in Nebraska City, all led to criminal trials of civilians by military tribunals which were upheld by decisions of state and lower federal courts. *State ex rel. Mays* v. *Brown,* 71 W. Va. 519, 77 S. E. 243; *Ex parte Jones,* 71 W. Va. 567, 77 S. E. 1029; *United States ex rel. McMaster* v. *Wolters,* 268 F. 69; *United States ex rel. Seymour* v. *Fischer,* 280 F. 208. But cf. *In re McDonald,* 49 Mont. 454. All these cases rested on the ground that the Governor's determination of the existence of insurrection conclusively established that all the Governor had done was legal. The basis of these decisions was definitely held erroneous in *Sterling* v. *Constantin,* 287 U. S. 378, where this Court said: "What are the allowable limits of military discretion, and whether or not they have been overstepped in a particular case, are judicial questions." 287 U. S. at 401. As one commentator puts it, this Court "has knocked out the prop" on which these aforementioned cases rested. Wiener, A Practical Manual of Martial Law, 1940, p. 116.

the Governor, and not the Commanding General, ordered the troops to detain citizens without trial and to aid the Auditor in doing all he thought necessary to stop the riot.[19] Once more, the military authorities did not undertake to supplant the courts and to establish military tribunals to try and punish ordinary civilian offenders.[20]

Courts and their procedural safeguards are indispensable to our system of government. They were set up by our founders to protect the liberties they valued. *Ex parte Quirin*, 317 U. S. 1, 19. Our system of government clearly is the antithesis of total military rule and the founders of this country are not likely to have contemplated complete military dominance within the limits of a territory made part of this country and not recently taken from an enemy. They were opposed to governments that placed in the hands of one man the power to make, interpret and enforce the laws. Their philosophy has been the people's throughout our history. For that reason we have maintained legislatures chosen by citizens or their representatives and courts and juries to try those who violate legislative enactments. We have always been especially concerned about the potential evils of summary criminal trials and have guarded against them by provisions embodied in the Constitution itself. See *Ex parte Milligan*, 4 Wall. 2; *Chambers* v. *Florida*, 309 U. S. 227. Legislatures and courts are not merely cherished American institutions; they are indispensable to our Government.

Military tribunals have no such standing. For as this Court has said before: ". . . the military should always

---

[19] Senate Document No. 263, 67th Cong., 2d Sess., 190 ff., 210 ff.

[20] Even as late as 1937 when the War Department promulgated regulations concerning the employment of troops in aid of civil authorities, it was aware of this tradition. A. R. 500–50, ¶ 7e stated: ". . . Persons not normally subject to military law, taken into custody by the military forces incident to the use of troops contemplated by these regulations, should be turned over to the civil authorities. Punishment in such cases belongs to the courts of justice and not to the armed forces." But cf. A. R. 500–50, ¶ 8 (1945).

be kept in subjection to the laws of the country to which it belongs, and that he is no friend to the Republic who advocates the contrary. The established principle of every free people is, that the law shall alone govern; and to it the military must always yield." *Dow* v. *Johnson*, 100 U. S. 158, 169. Congress prior to the time of the enactment of the Organic Act had only once authorized the supplanting of the courts by military tribunals. Legislation to that effect was enacted immediately after the South's unsuccessful attempt to secede from the Union. Insofar as that legislation applied to the Southern States after the war was at an end it was challenged by a series of Presidential vetoes as vigorous as any in the country's history.[21] And in order to prevent this Court from passing on the constitutionality of this legislation Congress found it necessary

---

[21] In one of these vetoes President Johnson said: "The trials having their origin under this bill are to take place without the intervention of a jury and without any fixed rules of law or evidence. The rules on which offenses are to be 'heard and determined' by the numerous agents are such rules and regulations as the President, through the War Department, shall prescribe. No previous presentment is required nor any indictment charging the commission of a crime against the laws; but the trial must proceed on charges and specifications. The punishment will be, not what the law declares, but such as a court-martial may think proper; and from these arbitrary tribunals there lies no appeal, no writ of error to any of the courts in which the Constitution of the United States vests exclusively the judicial power of the country." Messages and Papers of the Presidents, Richardson, Vol. VI, 399. In another he said: "It is plain that the authority here given to the military officer amounts to absolute despotism. But to make it still more unendurable, the bill provides that it may be delegated to as many subordinates as he chooses to appoint, for it declares that he shall 'punish or cause to be punished.' Such a power has not been wielded by any monarch in England for more than five hundred years. . . . This broad principle limits all our functions and applies to all subjects. It protects not only the citizens of States which are within the Union, but it shields every human being who comes or is brought under our jurisdiction. We have no right to do in one place more than in another that which the Constitution says we shall not do at all." *Id.*, pp. 502–503.

to curtail our appellate jurisdiction.[22] Indeed, prior to the Organic Act, the only time this Court had ever discussed the supplanting of courts by military tribunals in a situation other than that involving the establishment of a military government over recently occupied enemy territory, it had emphatically declared that "civil liberty and this kind of martial law cannot endure together; the antagonism is irreconcilable; and, in the conflict, one or the other must perish." *Ex parte Milligan,* 4 Wall. 2, 124–125.

We believe that when Congress passed the Hawaiian Organic Act and authorized the establishment of "martial law" it had in mind and did not wish to exceed the boundaries between military and civilian power, in which our people have always believed, which responsible military and executive officers had heeded, and which had become part of our political philosophy and institutions prior to the time Congress passed the Organic Act. The phrase "martial law" as employed in that Act, therefore, while intended to authorize the military to act vigorously for the maintenance of an orderly civil government and for the defense of the Islands against actual or threatened rebellion or invasion, was not intended to authorize the supplanting of courts by military tribunals. Yet the Government seeks to justify the punishment of both White and Duncan on the ground of such supposed congressional authorization. We hold that both petitioners are now entitled to be released from custody.

*Reversed.*

Mr. Justice Jackson took no part in the consideration or decision of these cases.

Mr. Justice Murphy, concurring.

The Court's opinion, in which I join, makes clear that the military trials in these cases were unjustified by the

---

[22] *Ex parte McCardle,* 6 Wall. 318. See also Warren, The Supreme Court in United States History, Vol. 2, 464, 484.

martial law provisions of the Hawaiian Organic Act. Equally obvious, as I see it, is the fact that these trials were forbidden by the Bill of Rights of the Constitution of the United States, which applies in both spirit and letter to Hawaii. Indeed, the unconstitutionality of the usurpation of civil power by the military is so great in this instance as to warrant this Court's complete and outright repudiation of the action.

Abhorrence of military rule is ingrained in our form of government. Those who founded this nation knew full well that the arbitrary power of conviction and punishment for pretended offenses is the hallmark of despotism. See The Federalist, No. 83. History had demonstrated that fact to them time and again. They shed their blood to win independence from a ruler who they alleged was attempting to render the "Military independent of and superior to the Civil power" and who was "depriving us . . . of the benefits of Trial by Jury." In the earliest state constitutions they inserted definite provisions placing the military under "strict subordination" to the civil power at all times and in all cases. And in framing the Bill of Rights of the Federal Constitution they were careful to make sure that the power to punish would rest primarily with the civil authorities at all times. They believed that a trial by an established court, with an impartial jury, was the only certain way to protect an individual against oppression. The Bill of Rights translated that belief into reality by guaranteeing the observance of jury trials and other basic procedural rights foreign to military proceedings. This supremacy of the civil over the military is one of our great heritages. It has made possible the attainment of a high degree of liberty regulated by law rather than by caprice. Our duty is to give effect to that heritage at all times, that it may be handed down untarnished to future generations.

Such considerations led this Court in *Ex parte Milligan*, 4 Wall. 2, to lay down the rule that the military lacks

any constitutional power in war or in peace to substitute its tribunals for civil courts that are open and operating in the proper and unobstructed exercise of their jurisdiction. Only when a foreign invasion or civil war actually closes the courts and renders it impossible for them to administer criminal justice can martial law validly be invoked to suspend their functions. Even the suspension of power under those conditions is of a most temporary character. "As necessity creates the rule, so it limits its duration; for, if this government is continued *after* the courts are reinstated, it is a gross usurpation of power." *Id.*, 127.

Tested by the *Milligan* rule, the military proceedings in issue plainly lacked constitutional sanction. Petitioner White was arrested for embezzlement on August 20, 1942, by the provost marshal. Two days later he was orally informed of the charges against him. Various motions, including a request for a jury trial and for time to prepare a defense, were overruled. On August 25 he was convicted and sentenced to five years in prison. Petitioner Duncan was accorded similar streamlined treatment by the military. On February 24, 1944, he engaged in a fight with two armed sentries at the Navy Yard at Honolulu. He was promptly tried without a jury in the provost court on March 2 and sentenced to six months at hard labor, despite his plea of self-defense. Both the petitioners were civilians entitled to the full protection of the Bill of Rights, including the right to jury trial.

It is undenied that the territorial courts of Hawaii were open and functioning during the period when the foregoing events took place. Martial law was proclaimed on December 7, 1941, immediately after the attack on Pearl Harbor; provost courts and military commissions were immediately established for the trial of civilians accused of crime. General Orders No. 4. On the next day, December 8, the territorial courts were closed by military

order. Thereafter criminal cases of all description, whether involving offenses against federal or territorial law or violations of military orders, were handled in the provost courts and military commissions. Eight days later, however, the military permitted the reopening of the courts for the trial of limited classes of cases not requiring juries or the subpoenaing of witnesses. General Orders No. 29. On January 27, 1942, further power was restored to the courts by designating them "as agents of the Military Governor" to dispose of civil cases except those involving jury trials, habeas corpus and other specified matters and to exercise criminal jurisdiction in limited types of already pending cases. General Orders No. 57. Protests led to the issuance of General Orders No. 133 on August 31, 1942, expanding the jurisdiction of civil courts to cover certain types of jury trials. But General Orders No. 135, issued on September 4, 1942, continued military jurisdiction over offenses directed against the Government or related to the war effort. Proclamations on February 8, 1943, provided that the jurisdiction of the courts was to be reestablished in full except in cases of criminal and civil suits against persons in the armed forces and except for "criminal prosecutions for violations of military orders." These proclamations became effective on March 10, together with a revised code of military orders. Martial law was finally lifted from Hawaii on October 24, 1944.

There can be no question but that when petitioners White and Duncan were subjected to military trials on August 25, 1942, and March 2, 1944, respectively, the territorial courts of Hawaii were perfectly capable of exercising their normal criminal jurisdiction had the military allowed them to do so. The Chief Justice of the supreme court of Hawaii stated that after the month of April, 1942, he knew of "no sound reason for denial of trial by jury to civilians charged with criminal offense under the

laws of the Territory." The Governor of the Territory also testified that the trial of civilians before military courts for offenses against the laws of the Territory was unnecessary and unjustified by the conditions in the Territory when petitioner White was charged with embezzlement in August, 1942. In short, the Bill of Rights disappeared by military fiat rather than by military necessity.

Moreover, there is no question here as to the loyalty of the Hawaiian judiciary or as to the desire and ability of the judges to cooperate fully with military requirements. There is no evidence of disorder in the community which might have prevented the courts from conducting jury trials. As was said in the *Milligan* case, p. 127, "It is difficult to see how the *safety* of the country required martial law in Indiana [Hawaii]. If any of her citizens were plotting treason, the power of arrest could secure them, until the government was prepared for their trial, when the courts were open and ready to try them. It was as easy to protect witnesses before a civil as a military tribunal; and as there could be no wish to convict, except on sufficient legal evidence, surely an ordained and established court was better able to judge of this than a military tribunal composed of gentlemen not trained to the profession of the law." Thus, since the courts were open and able to function, the military trials of the petitioners were in violation of the Constitution. Whether, if the courts had been closed by necessity, the military could have tried the petitioners or merely could have held them until the courts reopened is a constitutional issue absent from these cases.

The so-called "open court" rule of the *Milligan* case, to be sure, has been the subject of severe criticism, especially by military commentators. That criticism is repeated by the Government in these cases. It is said that the fact that courts are open is but one of many factors relevant to determining the necessity and hence the con-

stitutionality of military trials of civilians. The argument is made that however adequate the "open court" rule may have been in 1628 or 1864 it is distinctly unsuited to modern warfare conditions where all of the territories of a warring nation may be in combat zones or imminently threatened with long-range attack even while civil courts are operating. Hence if a military commander, on the basis of his conception of military necessity, requires all civilians accused of crime to be tried summarily before martial law tribunals, the Bill of Rights must bow humbly to his judgment despite the unquestioned ability of the civil courts to exercise their criminal jurisdiction.

The argument thus advanced is as untenable today as it was when cast in the language of the Plantagenets, the Tudors and the Stuarts. It is a rank appeal to abandon the fate of all our liberties to the reasonableness of the judgment of those who are trained primarily for war. It seeks to justify military usurpation of civilian authority to punish crime without regard to the potency of the Bill of Rights. It deserves repudiation.

The untenable basis of this proposed reversion back to unlimited military rule is revealed by the reasons advanced in support of the reasonableness of the military judgment that it was necessary, even though the civil courts were open and fully able to perform their functions, to impose military trials on all persons accused of crime in Hawaii at the time when the petitioners were tried and convicted:

*First.* According to the testimony of Admiral Nimitz and General Richardson, Hawaii was in the actual theatre of war from December 7, 1941, through the period in question. They stated that there was at all times a danger of invasion, at least in the nature of commando raids or submarine attacks, and that public safety required the imposition of martial law. For present purposes it is unnecessary to dispute any of such testimony. We may

assume that the threat to Hawaii was a real one; we may also take it for granted that the general declaration of martial law was justified. But it does not follow from these assumptions that the military was free under the Constitution to close the civil courts or to strip them of their criminal jurisdiction, especially after the initial shock of the sudden Japanese attack had been dissipated.

From time immemorial despots have used real or imagined threats to the public welfare as an excuse for needlessly abrogating human rights. That excuse is no less unworthy of our traditions when used in this day of atomic warfare or at a future time when some other type of warfare may be devised. The right to jury trial and the other constitutional rights of an accused individual are too fundamental to be sacrificed merely through a reasonable fear of military assault. There must be some overpowering factor that makes a recognition of those rights incompatible with the public safety before we should consent to their temporary suspension. If those rights may safely be respected in the face of a threatened invasion, no valid reason exists for disregarding them. In other words, the civil courts must be utterly incapable of trying criminals or of dispensing justice in their usual manner before the Bill of Rights may be temporarily suspended. "Martial law [in relation to closing the courts] cannot arise from a *threatened* invasion. The necessity must be actual and present; the invasion real, such as effectually closes the courts and deposes the civil administration." *Ex parte Milligan, supra,* 127.

*Second.* Delays in the civil courts and slowness in their procedure are also cited as an excuse for shearing away their criminal jurisdiction, although lack of knowledge of any undue delays in the Hawaiian courts is admitted. It is said that the military "cannot brook a delay" and that "the punishment must be swift; there is an element of time in it, and we cannot afford to let the trial linger

and be protracted." This military attitude toward constitutional processes is not novel. Civil liberties and military expediency are often irreconcilable. It does take time to secure a grand jury indictment, to allow the accused to procure and confer with counsel, to permit the preparation of a defense, to form a petit jury, to respect the elementary rules of procedure and evidence and to judge guilt or innocence according to accepted rules of law. But experience has demonstrated that such time is well spent. It is the only method we have of insuring the protection of constitutional rights and of guarding against oppression. The swift trial and punishment which the military desires is precisely what the Bill of Rights outlaws. We would be false to our trust if we allowed the time it takes to give effect to constitutional rights to be used as the very reason for taking away those rights. It is our duty, as well as that of the military, to make sure that such rights are respected whenever possible, even though time may be consumed.

*Third.* It is further said that the issuance of military orders relating to civilians required that the military have at its disposal some sort of tribunal to enforce those regulations. Any failure of civil courts to convict violators of such regulations would diminish the authority and ability to discharge military responsibilities. This is the ultimate and most vicious of the arguments used to justify military trials. It assumes without proof that civil courts are incompetent and are prone to free those who are plainly guilty. It assumes further that because the military may have the valid power to issue regulations there must be an accompanying power to punish the violations of those regulations; the implicit and final assumption is then made that the military must have power to punish violations of all other statutes and regulations. Nothing is more inconsistent with our form of government, with its distinction between the power to promulgate law and the power

332

to punish violations of the law. Application of this doctrine could soon lead to the complete elimination of civil jurisdiction over crime.

Moreover, the mere fact that it may be more expedient and convenient for the military to try violators of its own orders before its own tribunals does not and should not furnish a constitutional basis for the jurisdiction of such tribunals when civil courts are in fact functioning or are capable of functioning. Constitutional rights are rooted deeper than the wishes and desires of the military.

*Fourth.* Much is made of the assertion that the civil courts in Hawaii had no jurisdiction over violations of military orders by civilians and that military courts were therefore necessary. Aside from the fact that the civil courts were ordered not to attempt to exercise such jurisdiction, it is sufficient to note that Congress on March 21, 1942, vested in the federal courts jurisdiction to enforce military orders with criminal penalties. 56 Stat. 173. It is undisputed that the federal court in Hawaii was open at all times in issue and was capable of exercising criminal jurisdiction. That the military refrained from using the statutory framework which Congress erected affords no constitutional justification for the creation of military tribunals to try such violators.

*Fifth.* Objection is made to the enforcement in civil courts of military orders on the ground that it would subject the military to "all sorts of influences, political and otherwise, as happened in the cases on the east coast in both Philadelphia and Boston" and that "it is inconceivable that the Military Commander should be subjected for the enforcement of his orders to the control of other agents." This is merely a military criticism of the proposition that in this nation the military is subordinate to the civil authority. It does not qualify as a recognizable reason for closing the civil courts to criminal cases.

*Sixth.* Further objection is made that the holding of civil trials might interrupt vital work through the attendance as jurors of war workers. This also is too unmeritorious to warrant serious or lengthy discussion. War workers could easily have been excused from jury duty by military order if necessary.

*Seventh.* The final reason advanced relates to the testimony of military leaders that Hawaii is said to have a "heterogeneous population with all sorts of affinities and loyalties which are alien in many cases to the philosophy of life of the American Government," one-third of the civilian population being of Japanese descent. The court below observed, 146 F. 2d 576, 580, that "Governmental and military problems alike were complicated by the presence in the Territory of tens of thousands of citizens of Japanese ancestry besides large numbers of aliens of the same race. Obviously the presence of so many inhabitants of doubtful loyalty posed a continuing threat to the public security. Among these people the personnel of clandestine landing parties might mingle freely, without detection. Thus was afforded ideal cover for the activities of the saboteur and the spy. . . . To function in criminal matters the civilian courts must assemble juries; and citizens of Japanese extraction could not lawfully be excluded from jury panels on the score of race— even in cases of offenses involving the military security of the Territory. Indeed the mere assembling of juries and the carrying on of protracted criminal trials might well constitute an invitation to disorder as well as an interference with the vital business of the moment." The Government adds that many of the military personnel stationed in Hawaii were unaccustomed to living in such a community and that "potential problems" created in Hawaii by racially mixed juries in criminal cases have heretofore been recognized "although, on the whole, it has been found that members of such mixed juries have not acted on a racial basis."

The implication apparently is that persons of Japanese descent, including those of American background and training, are of such doubtful loyalty as a group as to constitute a menace justifying the denial of the procedural rights of all accused persons in Hawaii. It is also implied that persons of Japanese descent are unfit for jury duty in Hawaii and that the problems arising when they serve on juries are so great as to warrant dispensing with the entire jury system in Hawaii if the military so desires. The lack of any factual or logical basis for such implications is clear. It is a known fact that there have been no recorded acts of sabotage, espionage or fifth column activities by persons of Japanese descent in Hawaii either on or subsequent to December 7, 1941. There was thus no security reason for excluding them from juries, even making the false assumption that it was impossible to separate the loyal from the disloyal. And if there were problems arising from the use of racially mixed juries, elimination of all jury trials was hardly a reasonable or sensible answer to those problems. Especially deplorable, however, is this use of the iniquitous doctrine of racism to justify the imposition of military trials. Racism has no place whatever in our civilization. The Constitution as well as the conscience of mankind disclaims its use for any purpose, military or otherwise. It can only result, as it does in this instance, in striking down individual rights and in aggravating rather than solving the problems toward which it is directed. It renders impotent the ideal of the dignity of the human personality, destroying something of what is noble in our way of life. We must therefore reject it completely whenever it arises in the course of a legal proceeding.

The reasons here advanced for abandoning the "open court" rule of the *Milligan* case are without substance. To retreat from that rule is to open the door to rampant militarism and the glorification of war, which have de-

stroyed so many nations in history. There is a very necessary part in our national life for the military; it has defended this country well in its darkest hours of trial. But militarism is not our way of life. It is to be used only in the most extreme circumstances. Moreover, we must be on constant guard against an excessive use of any power, military or otherwise, that results in the needless destruction of our rights and liberties. There must be a careful balancing of interests. And we must ever keep in mind that "The Constitution of the United States is a law for rulers and people, equally in war and in peace, and covers with the shield of its protection all classes of men, at all times, and under all circumstances." *Ex parte Milligan,* *supra,* 120–121.

Mr. Chief Justice Stone, concurring.

I concur in the result.

I do not think that "martial law," as used in § 67 of the Hawaiian Organic Act, is devoid of meaning. This Court has had occasion to consider its scope and has pointed out that martial law is the exercise of the power which resides in the executive branch of the Government to preserve order and insure the public safety in times of emergency, when other branches of the Government are unable to function, or their functioning would itself threaten the public safety. *Luther* v. *Borden,* 7 How. 1, 45. It is a law of necessity to be prescribed and administered by the executive power. Its object, the preservation of the public safety and good order, defines its scope, which will vary with the circumstances and necessities of the case. The exercise of the power may not extend beyond what is required by the exigency which calls it forth. *Mitchell* v. *Harmony,* 13 How. 115, 133; *United States* v. *Russell,* 13 Wall. 623, 628; *Raymond* v. *Thomas,* 91 U. S. 712, 716; *Sterling* v. *Constantin,* 287 U. S. 378, 400, 401. Any doubts that might be enter-

tained that such is the true limit of martial law in this case are put at rest by § 67 of the Hawaiian Organic Act, which, "in case of rebellion or invasion, or imminent danger thereof," authorizes martial law only "when the public safety requires it . . ."

The Executive. has broad discretion in determining when the public emergency is such as to give rise to the necessity of martial law, and in adapting it to the need. Cf. *Hirabayashi* v. *United States,* 320 U. S. 81. But executive action is not proof of its own necessity, and the military's judgment here is not conclusive that every action taken pursuant to the declaration of martial law was justified by the exigency. In the substitution of martial law controls for the ordinary civil processes, "what are the allowable limits of military discretion, and whether or not they have been overstepped in a particular case, are judicial questions." *Sterling* v. *Constantin, supra,* 401.

I take it that the Japanese attack on Hawaii on December 7, 1941, was an "invasion" within the meaning of § 67. But it began and ended long before these petitioners were tried by military tribunals in August 1942 and February 1944. I assume that there was danger of further invasion of Hawaii at the times of those trials. I assume also that there could be circumstances in which the public safety requires, and the Constitution permits, substitution of trials by military tribunals for trials in the civil courts. But the record here discloses no such conditions in Hawaii, at least during the period after February, 1942, and the trial court so found. After closing places of amusement, and after closing the civil courts on December 8, 1941, the military authorities, on December 24, 1941, ordered places of amusement to be opened. On January 27, 1942, they permitted the courts to exercise their normal functions except as to jury trials and the issuance of writs of habeas corpus. On February 4, 1942, they authorized the sale of liquor at bars.

The full record in this case shows the conditions prevailing in Hawaii throughout 1942 and 1943. It demonstrates that from February 1942 on, the civil courts were capable of functioning, and that trials of petitioners in the civil courts no more endangered the public safety than the gathering of the populace in saloons and places of amusement, which was authorized by military order. I find nothing in the entire record which would fairly suggest that the civil courts were unable to function with their usual efficiency at the times these petitioners were tried, or that their trial by jury in a civil court would have endangered good order or the public safety. The Governor of Hawaii and the Chief Justice of the Hawaiian supreme court testified to the contrary. The military authorities themselves testified and advanced no reason which has any bearing on public safety or good order for closing the civil courts to the trial of these petitioners, or for trying them in military courts. I can only conclude that the trials and the convictions upon which petitioners are now detained, were unauthorized by the statute, and without lawful authority.

We have no occasion to consider whether the arrest and detention of petitioners by the military authorities, pending their delivery to the civil authorities for trial, would have been lawful. The judgment of the circuit court of appeals should be reversed and the petitioners discharged from custody forthwith.

MR. JUSTICE BURTON, with whom MR. JUSTICE FRANKFURTER concurs, dissenting.

With the rest of this Court I subscribe unreservedly to the Bill of Rights. I recognize the importance of the civil courts in protecting individual rights guaranteed by the Constitution. I prefer civil to military control of civilian life and I agree that in war our Constitution contemplates the preservation of the individual rights of all

of our people in accordance with a plan of constitutional procedure fitted to the needs of a self-governing republic at war.

Our Constitution expressly provides for waging war, and it is with the constitutional instruments for the successful conduct of war that I am concerned. I recognize here, as elsewhere, the constitutional direction that our respective branches of the Government do not exceed their allotted shares of authority. The courts, as well as our other agencies of the Government, accordingly owe a constitutional obligation not to invade the fields reserved either to the people, the States, or the other coordinate branches of the Government. The courts have an obligation to help define and protect the discretion with which the people have invested their legislative and executive representatives. Within their proper spheres, the robust strength and freedom of action allowed to the policy making and policy executing agencies of our Government are as vital to the success of our great experiment in securing "the Blessings of Liberty to ourselves and our Posterity" as are the checks and balances which have been imposed upon our representatives. It is in the application of these views to the cases before us that I am obliged to dissent from the majority of this Court and to sound a note of warning against the dangers of overexpansion of judicial control into the fields allotted by the Constitution to agencies of legislative and executive action.

The controlling facts in the cases before us are the extraordinary conditions created by the surprise Japanese invasion by air of Pearl Harbor on December 7, 1941. Visualizing the devastating success of that attack and the desperate conditions resulting from it, the primary question is what discretionary action by the executive branch of our Government, including the Army and Navy, was permissible on that day and in the period following it.

Pearl Harbor and the Hawaiian Islands were the key to America's defenses in the Pacific. The attack of December 7th destroyed more of America's naval forces than our Government felt it safe to announce. America's first line of defense was pierced. The attack demonstrated that it was part of a carefully planned major military operation against not only Hawaii but the United States. Presumably it would be pressed further. It might well be followed by a land invasion of the Islands and by aerial attacks upon their centers of population.[1]

---

[1] Admiral Chester W. Nimitz, Commander in Chief of the Pacific Fleet, who assumed naval command in the Territory of Hawaii December 18, 1941, testified that the Hawaiian area constituted the only base for the Navy in the Pacific Ocean at that time and that throughout the war until the last Japanese carrier was destroyed, a Japanese surprise carrier attack on the Islands was within the enemy's capabilities. While invasion by sea-borne troops in sufficient number to seize a beach head was not probable, invasion by submarine commando raiders and espionage parties was imminent and constantly impending. Lieutenant General Robert C. Richardson, Jr., Commanding General of the Central Pacific Area, who assumed command of the Hawaiian Department on June 1, 1943, testified that the Islands were within the theatre of operations of the Pacific Ocean area and that the Islands were the keystone of the defense of the western coast of our country. He testified that the Japanese fleet in April, 1944, was still capable of making a surprise attack upon Oahu by the use of air or undersea craft and that Pearl Harbor was the most attractive target for the enemy because it was the base of the Pacific fleet. He said that it was likely that Japan would take the risk of launching an attack because of the attractiveness of the target and the considerable damage that might be inflicted. He pointed out that the probability of night attacks through the use of submarines and parties sent ashore to attack important installations was increased by the presence of disloyal individuals among the population of the Islands. The successes of our fleet had not removed the imminent danger of invasion because these successes made it more imperative for the enemy to repeat its former invasion of the Islands. He further testified that the discharge of his responsibility for military security required a method of enforcement of military security regulations which was prompt and subject to his

Handicapped by major losses of air and sea power, the commander of this isolated outpost was faced with imminent danger of further invasions under conditions calling for a desperate defense of the Islands. The Islands suddenly had become the focal point of a major action which converted them into an outpost of critical military importance to the world in general and to the United States in particular. Their invasion and possible capture overshadowed every other consideration. The Islands were a white-hot center of war ready to burst into flames.

Military attack by air, sea and land was to be expected. The complete disregard of international law evi-

---

immediate control and authority and that under martial law the provost courts provided such a method of enforcement. He testified that a military trial for such an offense as that of Duncan in attacking the Pearl Harbor Navy Yard sentries was necessary in order to uphold the authority of military sentries charged with important military duties. He also gave as his opinion that military necessity required trial of White's offense in a military tribunal in August of 1942 at which time the Japanese successful military offensive still continued. In addition to the occupation of Hong Kong, the Malay Peninsula, Singapore, the Dutch East Indies, and bases in New Guinea, the Japanese had successfully occupied our own territories of Guam and Wake which, with Midway, constituted the island chain connecting Hawaii with the Philippines which themselves were soon occupied. The enemy's occupation of the Solomon Islands, including Tulagi and Guadalcanal, gave the enemy advance air and naval bases for offensive operations against our South Pacific supply line and the north coast of Australia. Biennial Report of the Chief of Staff of the United States Army to the Secretary of War (1943) 14 (House Doc. 288, 78th Cong., 1st Sess.); McInnis, *The War, Third Year* (1942) 238.

Early in May, 1942, one Japanese attempt to extend enemy control southeastward along the borders of the Coral Sea with the ultimate objective of an attack on Australia, was repulsed in the Battle of the Coral Sea. The Japanese offensive, however, continued. In early June the Japanese attempt to occupy Midway Island preliminary to an invasion of Hawaii was thwarted in the Battle of Midway. At the same time, however, Japanese forces occupied our territory of Attu,

denced by the first attack and the possible presence on the Islands of many Japanese collaborators gave warning that the enemy's next move might take the form of disastrous sabotage and terrorism among civilians. The extraordinary breach of international law evidenced by the attack made it essential to take extraordinary steps to protect the Islands against subversive action that might spring from deeply laid plans as secret, well aimed, and destructive as the original attack.

On December 7 and in the period immediately following, every inch of the Territory of Hawaii was like a frontier stockade under savage attack with notice that such attack would not be restrained by the laws of civilized

---

Agattu and Kiska in the Aleutian Islands. Biennial Report, *supra*, p. 30. (These islands were not recovered until May, 1943. Biennial Report, *supra*, p. 31.) Japanese advances in New Guinea continued during the summer of 1942 and by September, 1942, had forced Allied ground forces back to within 30 miles of Port Moresby, a gateway to Australia. Biennial Report, *supra*, p. 14. On August 7 a landing was made on Guadalcanal by United States forces. For a time it did not appear that the effort to wrest this crucial island from the Japanese could succeed. A strong Japanese attempt to recapture Guadalcanal was beaten off as late as November 16, 1942. Not until early in 1943 was enemy resistance on Guadalcanal overcome. *Ibid.* Even then our forces had only succeeded in checking the enemy's offensive and had not launched their own offensives or ousted the enemy from any American territory. The American offensive in the Central Pacific did not begin until a year later with the invasion of the Gilbert Islands in November, 1943, followed by invasion of the Marshall Islands in January, 1944, and the invasion of the Mariana Islands in July, 1944. Biennial Report of the Chief of Staff of the United States Army to the Secretary of War (1945) 69. Our forces landed on Guam on July 21 and resistance ceased on August 10. By that time our forces in the Southwest Pacific under General MacArthur had reduced or by-passed the enemy's footholds in New Guinea and the way was prepared for the Battle of the Philippines which began with the landing on Leyte on October 20, 1944. *Id.*, p. 75 *et seq.* The "Battle of the Bulge," in the Ardennes, was fought and won at high cost in December and January, 1944–45. *Id.*, p. 44.

nations.[2] Measures of defense had to be taken on the basis that anything could happen. The relation of the Constitution of the United States to such a situation is important. Of course, the Constitution is not put aside. It was written by a generation fresh from war. The people established a more perfect union, in part, so that they might the better defend themselves from military attack. In doing so they centralized far more military power and responsibility in the Chief Executive than previously had been done. The Constitution was built for rough as well as smooth roads. In time of war the nation simply changes gears and takes the harder going under the same power.

The conduct of war under the Constitution is largely an executive function. Within the field of military action in time of war, the executive is allowed wide discretion. While, even in the conduct of war, there are many lines of jurisdiction to draw between the proper spheres of legislative, executive and judicial action, it seems clear that at least on an active battle field, the executive discretion to determine policy is there intended by the Constitution to be supreme. The question then arises: What is a battle field and how long does it remain one after the first barrage?

It is well that the outer limits of the jurisdiction of our military authorities is subject to review by our courts even under such extreme circumstances as those of the battle field. This, however, requires the courts to put themselves as nearly as possible in the place of those who had the

---

[2] "Hawaii constitutes the main Pacific outpost of the United States, and accordingly must be regarded as a fortress to whose defense the entire population of the Islands is committed. Its manpower and its economic resources must be subject to a single ultimate control." General Orders No. 133, by order of the Military Governor of the Territory of Hawaii, August 31, 1942.

constitutional responsibility for immediate executive action. For a court to recreate a complete picture of the emergency is impossible. That impossibility demonstrates the need for a zone of executive discretion within which courts must guard themselves with special care against judging past military action too closely by the inapplicable standards of judicial, or even military, hindsight. The nature of judicial authority is largely negative as contrasted with the generally positive nature of executive authority, and it is essential that the opportunity for well directed positive action be preserved and vigorously used if the Government is to serve the best interests of the people.

For this Court to intrude its judgment into spheres of constitutional discretion that are reserved either to the Congress or to the Chief Executive, is to invite disregard of that judgment by the Congress or by executive agencies under a claim of constitutional right to do so. On the other hand, this Court can contribute much to the orderly conduct of government, if it will outline reasonable boundaries for the discretion of the respective departments of the Government, with full regard for the limitations and also for the responsibilities imposed upon them by the Constitution.

It is important to approach the present cases with a full appreciation of the responsibility of the executive branch of the Government in Hawaii under the invasion which occurred on December 7, 1941. The question is not shall the Constitution apply under such circumstances? The question is with what authority has the Constitution and laws of this country vested the official representatives of the people upon whom are placed the responsibilities of leadership under those extraordinary circumstances?

The vital distinction is between conditions in "the theatre of actual military operations" and outside of that

theatre.[3] In this case Hawaii was not only in the theatre
of operations, it was under fire. If the Territory of
Hawaii, on that date and during the immediately suc-
ceeding period, is recognized as the battle field it was, then
under such circumstances of invasion and threat of im-
mediate further invasion, the actions taken by the Gov-
ernor of Hawaii and by the Commanding General of the
Hawaiian Department, supported by the President of the
United States, in suspending the writ of habeas corpus,
declaring martial law and vesting in such Commanding
General for those first several days the powers normally
exercised by the Governor and by the judicial officers
and employees of the Territory (at least to the extent

---

[3] "Again, in the place where actual military operations are being
conducted, the ordinary rights of citizens must yield to paramount
military necessity. This was conceded in Milligan's case [4 Wall. 2,
127], where it was said in the prevailing opinion:

" 'If, in foreign invasion or civil war, the courts are actually closed,
and it is impossible to administer criminal justice according to law,
then, on the theatre of actual military operations, where war really
prevails, there is a necessity to furnish a substitute for the civil au-
thority, thus overthrown, to preserve the safety of the army and so-
ciety; and as no power is left but the military, it is allowed to govern
by martial rule until the laws can have their free course.' " Address
by Hon. Charles E. Hughes, *War Powers Under the Constitution*
(1917) XLII Reports of American Bar Association 232, 244.

In the present cases the records have incorporated the following tes-
timony of Lt. Gen. Robert C. Richardson, Jr., U. S. A., Commanding
General of the Central Pacific Area:

"A. . . . this whole area under the command of the Commander-in-
Chief of the Pacific Ocean Area, Admiral Nimitz, is an active theatre
of war, and within that theatre of war is the theatre of operations,
of which the Hawaiian Department is a part.

"Q. Will you explain what you mean, from the military viewpoint,
by the terms 'active theatre of war' and 'theatre of operations'?

"A. Well, an active theatre of war is that area which is or may be-
come actively involved in the conduct of the war. A theatre of opera-
tions is that part of an active war theatre which is needed for the
operations either offensively or defensively, according to the missions

that would be involved in the present cases if they had arisen at that time), were within the executive discretion of the officials who authorized the action. The actual presence of battle in a community creates a substantially different condition from that which exists in other parts of a nation at war. That conditions of war and the means of meeting its emergencies were within the contemplation of the Constitution of the United States is shown by the broad authority vested in the President of the United States as Chief Executive and as Commander in Chief of the Army and Navy and in the war powers of the Congress and the Chief Executive to preserve the safety of

---

assigned or a combination of the missions; and it includes also the administrative agencies which are necessary for the conduct of those operations."

. . . . .

"Q. Is there any military parlance that indicates that portion of the earth's surface where the fighting actually takes place?

"A. Yes.

"Q. What is that called?

"A. Combat zone.

"Q. You would not call Hawaii a combat zone?

"A. Yes, I would, because the theatre of operations or the combat zone also includes that part assigned to your mission, whether it be offensive or defensive. We are on the defensive mission here in Oahu, whereas the fleet operates offensively from here, and some of our troops which are based here operate offensively from this base. But concurrently with its mission as an offensive base, we have a very decided mission here as a defensive base, and that defensive mission designates or characterizes it as a part of the combat zone.

"Q. Then a combat zone can be an area where no shooting is going on at all?

"A. Oh, yes; oh, yes.

"Q. No real destruction of life or property?

"A. Absolutely. . . .

"Q. Well, do you have any term, military term, that precisely fits the place where life and property is actually being destroyed as a result of organized warfare?

"A. Yes, the battle."

the nation in time of war. The present cases arose in a Territory of the United States, directly under the care and jurisdiction of the Federal Government. That conditions of actual invasion were contemplated by Congress in the Organic Act of Hawaii is seen from the provision quoted in the majority opinion to the effect that

> "whenever it becomes necessary . . . [the Governor] may call upon the commanders of the military and naval forces of the United States in the Territory of Hawaii, or summon the posse comitatus, or call out the militia of the Territory to prevent or suppress lawless violence, invasion, insurrection, or rebellion in said Territory, and he may, *in case of rebellion or invasion, or imminent danger thereof, when the public safety requires it, suspend the privilege of the writ of habeas corpus, or place the Territory, or any part thereof, under martial law until communication can be had with the President and his decision thereon made known.*" § 67 of the Hawaiian Organic Act, 31 Stat. 153, 48 U. S. C. § 532. (Italics supplied.)

The Governor's proclamation demonstrates that, in so far as the discretion lay in him, he recognized in those days that a condition had arisen calling for the exercise of these powers. The proclamation of December 7, 1941, in its every word is the best evidence of the exercise of this discretion and speaks for itself:

> "Whereas, it is provided by Section 67 of the Organic Act of the Territory of Hawaii, approved April 30, 1900, that, whenever it becomes necessary, the Governor of that territory may call upon the commander of the military forces of the United States in that territory to prevent invasion; and
> "Whereas, it is further provided by the said section that the governor may in case of invasion or imminent danger thereof, when the public safety requires it, suspend the privilege of the writ of habeas corpus and place the territory under martial law; and

"Whereas, the armed forces of the Empire of Japan have this day attacked and invaded the shores of the Hawaiian Islands; and

"Whereas, it has become necessary to repel such attack and invasion; and

"Whereas, the public safety requires;

"Now, Therefore, I, J. B. Poindexter, Governor of the Territory of Hawaii, do hereby announce that, pursuant to said section, I have called upon the Commanding General, Hawaiian Department, to prevent such invasion;

"And, pursuant to the same section, I do hereby suspend the privilege of the writ of habeas corpus until further notice;

"And, pursuant to the same section, I do hereby place the said territory under martial law;

"And, I do hereby authorize and request the Commanding General, Hawaiian Department, during the present emergency and until the danger of invasion is removed, to exercise all the powers normally exercised by me as Governor;

"And I do further authorize and request the said Commanding General, Hawaiian Department, and those subordinate military personnel to whom he may delegate such authority, during the present emergency and until the danger of invasion is removed, to exercise the powers normally exercised by judicial officers and employees of this territory and of the counties and cities therein, and such other and further powers as the emergency may require;

"And I do require all good citizens of the United States and all other persons within the Territory of Hawaii to obey promptly and fully, in letter and in spirit, such proclamations, rules, regulations and orders, as the Commanding General, Hawaiian Department, or his subordinates, may issue during the present emergency."

This action was communicated by him to the President and the President's decision upon his action was made known in accordance with the Organic Act of Hawaii in the following messages:

348

"Dec. 7, 1941

"The President the White House
Washington D C

I Have Today Declared Martial Law Throughout the Territory of Hawaii and Have Suspended the Privilege of the Writ of Habeas Corpus Period Your Attention Is Called to Section Sixty Seven of the Hawaiian Organic Act for Your Decision on My Action

POINDEXTER"

"December 9, 1941

"Honorable Joseph B. Poindexter,
Governor, Territory of Hawaii,
Honolulu, Hawaii.·

Your Telegram of December Seventh Received and Your Action in Suspending the Writ of Habeas Corpus and Placing the Territory of Hawaii Under Martial Law in Accordance with U. S. C., Title 48, Section 532 Has My Approval.

FRANKLIN D. ROOSEVELT"

The discretion to determine within reasonable limits the existence of the emergency of war contemplated by the Organic Act must be an executive discretion. Under the circumstances now generally known as to what took place at Pearl Harbor on December 7 and the seriousness of the threat which that attack carried with it, not only to the people in the Territory of Hawaii but to the United States of America, I am unable to find that on that day the President and the Governor exceeded their constitutional authority in taking the steps evidenced by the foregoing declaration of·policy or that the Commanding General exceeded his authority in carrying out those instructions through the issuance of his proclamation pursuant thereto on December 7, 1941.[4]

---

[4] "To the People of Hawaii:

"The military and naval forces of the Empire of Japan have attacked and attempted to invade these islands.

"Pursuant to section 67 of the Organic Act of the Territory of Hawaii, approved April 30, 1900, the Governor of Hawaii has called

The findings of fact, express and implicit in these prompt and forthright expressions of executive leadership,

upon me, as commander of the military forces of the United States in Hawaii, to prevent such invasion; has suspended the privilege of the writ of habeas corpus; has placed the Territory under martial law; has authorized and requested me and my subordinates to exercise the powers normally exercised by the governor and by subordinate civil officers; and has required all persons within the Territory to obey such proclamations, orders, and regulations as I may issue during the present emergency.

"I announce to the people of Hawaii, that, in compliance with the above requests of the Governor of Hawaii, I have this day assumed the position of military governor of Hawaii, and have taken charge of the government of the Territory, of the preservation of order therein, and of putting these islands in a proper state of defense.

"All persons within the Territory of Hawaii, whether residents thereof or not whether citizens of the United States or not, of no matter what race or nationality, are warned that by reason of their presence here they owe during their stay at least a temporary duty of obedience to the United States, and that they are bound to refrain from giving by word or deed, any aid or comfort to the enemies of the United States. Any violation of this duty is treason, and will be punished by the severest penalties.

"The troops under my command, in putting down any disorder or rebellion and in preventing any aid to the invader, will act with such firmness and vigor and will use such arms as the accomplishment of their task may require.

"The imminence of attack by the enemy and the possibility of invasion make necessary a stricter control of your actions than would be necessary or proper at other times. I shall therefore shortly publish ordinances governing the conduct of the people of the Territory with respect to the showing of lights, circulation, meetings, censorship, possession of arms, ammunition, and explosives, the sale of intoxicating liquors and other subjects.

"In order to assist in repelling the threatened invasion of our island home, good citizens will cheerfully obey this proclamation and the ordinances to be published; others will be required to do so. *Offenders will be severely punished by military tribunals or will be held in custody until such time as the civil courts are able to function.*

"Pending further instructions from this headquarters the Hawaii Defense Act and the Proclamations of the Governor of Hawaii heretofore issued thereunder shall continue in full force and effect." (Italics supplied.)

leave no room for doubt as to the genuineness of the emergency and of the conscientious determination of these officials to act so as to meet it. At the same time, the appreciation felt by the Commanding General of his responsibility to the civilians on the Islands is shown in his three concluding paragraphs. Starting with the propriety of that battle field regulation in the presence of disastrous invasion, the question resolves itself solely to one of when and to what extent the constitutional executive discretion to continue these orders can or should be held by this Court to have been exceeded. Once the Islands are visualized as a battle field under actual invasion, threatened with further invasion, and invaluable to the enemy as a base from which to attack the continental United States, the situation is completely changed from that of an ordinary civilian community. Under conditions likely to disregard even the laws of civilized warfare, the island population was threatened with immediate destruction. It thus became necessary to organize and protect that population against imminent danger from bombing, fire, disruption of water and food supply, disease and all the other incidents of modern warfare. The limited area, limited garrison and great isolation of the Islands put a premium on the efficiency of its civilian defense and on the integration of it with the military defense. All activity was subordinated to executive control as the best constitutional safeguard of the civilian as well as the military life.

That in such a case there must be restoration of civilian control is clear. It is equally clear that there must be limits to the extent to which the executive discretion constitutionally may delay such restoration. In the first instance, however, there is a period, bearing a reasonable relation to the original emergency, during which it must be within the discretion of the executive agencies of the Government to decide when and how to restore the battle field to its peace time controls.

In view of the responsibility placed upon the executive branch of the Government and especially upon its armed forces in time of invasion and threatened invasion, it is essential that that branch of the Government have freedom of action equal to its needs. At the center of invasion, military control is the proper control to be applied, subject to provisions of the Constitution, treaties and laws of the United States applicable to a battle field. On December 7, 1941, I believe that the facts of the invasion and threatened further invasion amply established such a condition and justified at the time the military control established on that basis throughout the Islands.

Whether or not from the vantage post of the present this Court may disagree with the judgment exercised by the military authorities in their schedule of relaxation of control is not material unless this Court finds that the schedule was so delayed as to exceed the range of discretion which such conditions properly vest in the military authorities.

It is all too easy in this postwar period to assume that the success which our forces attained was inevitable and that military control should have been relaxed on a schedule based upon such actual developments. In fact, however, even now our Chief of Staff in his report to the Secretary of War as of June 30, 1945, reminds us that in "the black days of 1942 when the Japanese conquered all of Malaysia, occupied Burma, and threatened India while the German armies approached the Volga and the Suez. . . . Germany and Japan came so close to complete domination of the world that we do not yet realize how thin the thread of Allied survival had been stretched." Biennial Report of the Chief of Staff of the United States Army (1945) 1.[5] Those were critical days when the

[5] See also the letters of General George C. Marshall, Chief of Staff, of September 25 and 27, 1944, to Governor Thomas E. Dewey, emphasizing the tragic military consequences which at that date would

United States could afford no military mistakes and when the safety and control of the Hawaiian key to the Pacific was essential. It was the responsibility of our military commanders not only to do the right thing in the interests of safety but to take no chances of error or surprise. It was the obligation of our military commanders to insure safety rather than to risk it. Acting as they were in the "fog of war," they were entitled to a wide range of discretion if they were to meet the obligations imposed upon them. It is not justifiable to tear Hawaii out from the context of the war as a whole. Our military policy there, as elsewhere, had to be guided by its relation to the global war.

Under these circumstances it is conceivable that the military authorities might have tried to continue complete military control in effect for a substantial period with a view to later relaxation of all such control when conditions made it obvious that there was no longer a need for any control. Such a course was not attempted here. The Commanding General of the Hawaiian Department followed from the beginning the policy foreshadowed in his original proclamation. He restored civilian control of civilian activities wherever and whenever he felt that a partial restoration of it was in the public interest. In the meantime he had the primary duty of maintaining law and order and of fostering civilian activities as much as possible. Perhaps he could have arrested and detained individuals charged with violation of laws or regulations and held them for later trial by civilian courts. However, in view of the size of the population and the necessarily limited facilities for large scale detentions, he owed an equal duty to dispose promptly of violations of the law.

---

follow disclosure that the United States had "broken" the Japanese secret message code. Hearings before Joint Committee of Congress to Investigate the Pearl Harbor Attack, 79th Cong., 2d Sess., Part III, 1128–1133.

To this end, law and order was enforced and justice was administered in the first instance through military tribunals. With evident care and with substantial rapidity the military control was relaxed gradually, in instance after instance, until the administration of justice over civilians was restored completely to civilian administration when, on October 19, 1944, the President issued a proclamation effective October 24, terminating martial law and directing the Governor to issue a proclamation accordingly.

There is set forth in the margin [6] a summary of the steps by which this relaxation was accomplished. As early

[6] Dec. 7, 1941. Governor Poindexter invoked § 67 of the Hawaiian Organic Act and by proclamation placed the Territory under martial law; suspended the privilege of the writ of habeas corpus; and delegated to the Commanding General of the Hawaiian Department of the United States Army not only all of his powers as Governor but also all of the "powers normally exercised by judicial officers . . . of this territory . . . during the present emergency and until the danger of invasion is removed . . ."

Dec. 7, 1941. By radio the Governor of Hawaii notified the President of the United States that he had placed the Territory under martial law and suspended the writ of habeas corpus.

Dec. 7, 1941. The Commanding General, Walter C. Short, referring specifically to Governor Poindexter's proclamation of the same date, himself issued a proclamation notifying the people of Hawaii that he had assumed the position of "Military Governor of Hawaii" and had taken over the government of Hawaii.

Dec. 7, 1941. The Military Governor of Hawaii issued General Orders No. 4 by which he set up a system of military courts to try civilians for violations of the laws of the United States, the laws of the Territory, and "rules, regulations, orders or policies" of the military authorities. The procedure prescribed for these military courts was that of special and summary courts martial.

Dec. 8, 1941. The courts of the Territory were closed by the Chief Justice of the Supreme Court of Hawaii under the direction of the Commanding General.

Dec. 9, 1941. The President approved by radio, the action of the Governor suspending the writ and placing the Territory under martial law in accordance with the Organic Act of Hawaii.

Dec. 16, 1941. By General Orders No. 29 the complete closing of

'as December 16, 1941, the courts were reopened in so far as they applied to civil matters not involving jury trials. On January 27, 1942, the restrictions on court procedure were further modified. On August 31, 1942, a general order extended the jurisdiction of the courts to jury trials. Further relaxation occurred from time to time in 1942 and 1943.

It was on August 20, 1942, that the petitioner White was arrested for embezzlement in violation of Chapter 183 of the Revised Laws of Hawaii. On August 25 he was tried and convicted before a provost court, and sentenced

the courts was partly relaxed. The relaxation affected only civil matters not involving jury trials.

Dec. 17, 1941. General Short transferred to General Emmons his powers as Military Governor of Hawaii.

Jan. 27, 1942. The Military Governor, by General Orders No. 57, modified further the restrictions on court proceedings. By this order the courts of the Territory were authorized to exercise certain of the powers normally exercised by them during the existence of civil government. With certain exceptions, the courts were restored to their respective functions prior to martial law, "as agents of the Military Governor." The criminal courts could not, under the order, summon a grand jury; and neither the criminal nor civil courts could grant a jury trial, or at any time grant a writ of habeas corpus.

Aug. 31, 1942. General Orders No. 133 extended the jurisdiction of the courts to jury trials. This order stated in § I: ". . . Martial law has been declared and the emergency which called it forth still prevails. . . . It is to be understood that the relaxation herein specified is intended to return to the courts criminal prosecutions and civil litigation to the extent that war conditions permit. However, this action is experimental in nature and the Military Governor reserves the right further to limit the jurisdiction of the courts or to close them entirely, if that course shall be necessary."

Sept. 4, 1942. General Orders No. 135 enumerated the criminal offenses involving crimes against the Government or related to the war effort, in respect to which the courts were not authorized to exercise jurisdiction.

Feb. 8, 1943. Governor Stainback, who succeeded Governor Poindexter, issued a public proclamation providing that, although martial

to five years' imprisonment, later reduced to four. In so far as the issue relates to his case, and in the light of the evident consideration that the Commanding General was giving to the restoration of civil control to the courts, I am unable to hold as a matter of law that, through not acting more quickly and less cautiously, he violated his constitutional discretion when on December 16, 1941, he authorized the civil courts to open to a limited extent for the trial of limited classes of cases not requiring jury trials or the subpoenaing of witnesses, or when on January 27, 1942, he authorized the civil courts, as agents of the Mili-

law and suspension of the privilege of the writ of habeas corpus were to remain in effect, the Governor and other civil agencies would resume their respective jurisdictions, including criminal and civil proceedings, except for criminal proceedings against members of the armed forces and civil suits against them for acts or omissions in the line of duty and criminal prosecutions for violations of military orders, except as these exceptions might be waived by the Commanding General in any particular case or class of cases.

Feb. 8, 1943. General Emmons, the Military Governor, issued a public proclamation relinquishing to the Governor and other civilian officers of the Territory the functions set forth in the Governor's proclamation.

Mar. 10, 1943. General Emmons issued a revised set of General Orders Nos. 1 to 14, and rescinded General Orders Nos. 1 to 181, issued under prior proclamations. General Orders No. 2 vested provost courts and military commissions with jurisdiction to try any case involving violations by a civilian of "rules, regulations, proclamations, or Orders of the Military or Naval authorities, or of the Military Governor of the Territory of Hawaii, or of the laws of war," and to impose a fine, imprisonment or both. Maximum punishment was to be confinement at hard labor for five years, or a fine of five thousand dollars or both.

Oct. 19, 1944. The President issued Proclamation No. 2627 providing that, effective Oct. 24, 1944, the privilege of the writ of habeas corpus was restored and martial law terminated and directing the Governor to issue a proclamation accordingly.

Oct. 24, 1944. The Governor issued a proclamation which proclaimed that "the privilege of the writ of habeas corpus is restored and that martial law is terminated in the Territory of Hawaii."

tary Government, to exercise their normal functions except for jury trials, writs of habeas corpus and other specified classes of cases, and when, on August 31, 1942, he extended their jurisdiction to jury trials such as would have applied to the petitioner White. Even on that date, in General Orders No. 133,[7] he found expressly that "martial law has been declared and the emergency which called it forth still prevails."

The petitioner Duncan was convicted on March 2, 1944, of maliciously assaulting and beating two marines on February 24, 1944, with intent to prevent their performance of their duties as sentries at the main gate of the Pearl Harbor Navy Yard. For this offense he was sentenced to six months in jail. At this time civilian agencies had resumed most of their peace time jurisdiction, including criminal and civil proceedings, except for criminal proceedings against members of the armed forces, civil suits against them for acts or omissions in line of duty and criminal prosecutions of violations of military orders. The close relationship of these items to the military functions of the armed forces on the Islands indicates the reasonableness of their exception. Even these exceptions were removed in October, 1944, when martial law was terminated. I find it impossible under these circumstances to hold that the President and the military authorities violated the discretion vested in them to insure the safety of the Islands in time of war, invasion and threatened invasion, in that they failed to terminate martial law so completely before March 2, 1944, that a civilian, who attacked marines on duty as sentries at the main gate of the Pearl Harbor Navy Yard, could insist upon a trial in the local criminal courts as distinguished from the local provost court which had exercised jurisdiction over such cases throughout the Japanese war which was still actively in progress.

[7] See Footnotes 2 and 6.

Now that the war has been won and the safety of the Islands has been again assured, there is opportunity, in the calm light of peace, for the readjustment of sentences imposed upon civilians and military personnel during the emergency of war and which have not yet expired. It is important, however, that in reviewing the constitutionality of the conduct of our agencies of government in time of war, invasion and threatened invasion, we do not now make precedents which in other emergencies may handicap the executive branch of the Government in the performance of duties allotted to it by the Constitution and by the exercise of which it successfully defended the nation against the greatest attack ever made upon it.

One way to test the soundness of a decision today that the trial of petitioner White on August 25, 1942, before a provost court on a charge of embezzlement and the trial of petitioner Duncan on March 2, 1944, before a similar court on a charge of maliciously assaulting marine sentries were unconstitutional procedures, is to ask ourselves whether or not on those dates, with the war against Japan in full swing, this Court would have, or should have, granted a writ of habeas corpus, an injunction or a writ of prohibition to release the petitioners or otherwise to oust the provost courts of their claimed jurisdiction. Such a test emphasizes the issue. I believe that this Court would not have been justified in granting the relief suggested at such times. Also I believe that this Court might well have found itself embarrassed had it ordered such relief and then had attempted to enforce its order in the theatre of military operations, at a time when the area was under martial law and the writ of habeas corpus was still suspended, all in accordance with the orders of the President of the United States and the Governor of Hawaii issued under their interpretation of the discretion and responsibility vested in them by the Constitution of the United States and by the Organic Act of Hawaii enacted by Congress.

In order to have the benefit of the full strength of our Constitution, both in time of peace and in time of war, it is necessary to protect the authority of our legislative and executive officials, as well as that of our courts, in the performance of their respective obligations to help to "establish Justice, insure domestic Tranquility, provide for the common defence, promote the general Welfare, and secure the Blessings of Liberty to ourselves and our Posterity."